**W. R. DAVIS, Inc., et al. v. STATE.**

No. 11572.

Court of Civil Appeals of Texas. Galveston.

Nov. 18, 1943.

Rehearing Denied Jan. 6, 1944.

L. W. Graves, Jr., Pat N. Fahey, and Taliaferro, Graves, Hutcheson & Fahey, all of Houston, for appellants.

Gerald C. Mann, Atty. Gen., and Geo. P. Blackburn, Fowler Roberts, Ocie Speer, and Geo. W. Barcus, Asst. Attys. Gen., for appellee.

Joseph W. Moore, of Houston, amicus curiae.

GRAVES, Justice.

This appeal is from a $6,809.44 judgment of the 126th District Court of Travis County, sitting without a jury, in favor of the appellee, the State of Texas, against the appellants (W. R. Davis, Inc., a dissolved corporation, and James Lee Kauffman, ancillary executory of the will and estate of W. R. Davis, deceased), as for the aggregate amount of occupation taxes, penalties, interest, and auditor's fees found by it to be due the State from the Davis estate as gas-production taxes under Article 7047b, Vernon's Annotated Civil Statutes of Texas, as amended by Article II of House Bill No. 8, c. 184, p. 269, Acts 1941, 47th Legislature.

The gas was produced by Earl Callaway and some 80 others (a few of whom were royalty owners only) from leases on gas-producing lands they held at Alice, Texas, and was processed for them by the appellants in their recycling plant there, under contracts between such parties, in which the appellants were given ½ of the distillates so extracted from the gas in return for such processing and, in addition, they agreed to and did buy the remaining ½ interest in such distillates or products of Callaway et al.; whereupon, appellants by recycling methods, returned—through "intake-wells" provided by Callaway et al.— the leftover or residue gas to the same gas-producing formation underlying the lands, from which it had first been extracted; such operations having thus disposed of all the gas produced from such lands during the period from May 1, 1941, ·to February 1, 1942.

The part of the statute, upon which alone the suit was thus founded, that is, Article 7047b, Vernon's Annotated Civil Statutes of Texas, as amended by Article II of House Bill No. 8 of the 47th Legislature in 1941, Sec. 1. (1), fourth paragraph, was in his verbis (except as to punctuation), as follows: "The market value of gas produced in this State shall be the value thereof plus any bonus, or premium, or anything of value paid therefor, or any sum of money that such gas will reasonably bring if produced and sold in accordance with the laws, rules and regulations of this State, provided, that notwithstanding any other pro-

vision herein to the contrary, where gas is processed for its liquid hydrocarbon content and the residue gas is returned by recycling methods to the same gas-producing formation underlying the land from which the gas is produced, the taxable value of such gas shall be three-fifths (⅗) of the gross value of all products extracted, separated and saved from such gas."

In inveighing here against the judgment so adverse to them, appellants attack the constitutionality of such entire Article 7047b, and particularly of the quoted portion thereof, supra, which is the only part, on the facts, directly involved here, as being violative of Article I, Sections 16, 17 and 19, and Article VIII, Sections 1 and 2, of the Constitution of Texas, Vernon's Ann.St., as well as of the 14th Amendment to the Constitution of the United States.

Regarding this claim of constitutional invalidity as lying at the threshold of the controversy, it will be disposed of first.

Since the State's action was predicated solely, as indicated, upon the quoted part of the amended statute—that having to do with processed gas—and since the controversy was tried out and the judgment rendered wholly upon the applicability of that particular provision, it follows that the facts do not bring any other provision of amended Article 7047b under review by this court, except subsidiarily; its deliverance will, therefore, be so confined, especially as the act itself, in preceding Section 8, Article 7047a—20, expressly provides that the striking down of any other detailed parts or portions thereof shall not affect the validity of the remaining ones.

■ This court is unable to see that appellants' objections point out any definite showing of the claimed invalidity; concluding, rather, that none is made to appear; indeed, it is thought this whole controversy—being so controllingly referable to the quoted portion of the act dealing with one specified kind of "processed" gas only, is relieved of any of the murk, uncertainty, or doubtfulness appellants at great length find in other detailed provisions dealing with distinctly different conditions, and finds quite a reasonable solution in its very clearly stated "Proviso"; that is, where the gas has been processed and the residue returned to the strata from which the natural product came, as all that is involved here had been, by the simple and undisputed facts, the act makes a reasonable, understandable, and easy-to-be-applied taxable basis for all that kind of gas, by providing that it shall be "three fifths (3/5) of the gross value of all products extracted, separated and saved from such gas."

That is made further clear in the beginning of such quoted paragraph where "market value", obviously used as synonymous with the "last mentioned" taxable value, is defined to be such value thereof, plus any bonus, premium, or anything else, paid as a consideration therefor.

It seems to this court, under the simple facts in this record, most of which were agreed upon, and the others established by undisputed evidence, that these provisions made a workable system, which the Comptroller of the State had no difficulty in carrying out; in fact, the oral testimony of his auditor, Mr. Brown, which, outside of written stipulations and documents, was all the trial court had before it, seems to this court to nullify appellants' secondary contention—after alleging the statute to be so uncertain, vague, and indefinite as to render it void—that the act "as enacted and applied by the Comptroller violates the principle of equality and uniformity of taxation in Texas." Being undisputed and uncontroverted on that direct point, it was this:

"Q. Do you know of any other contract between the producer and the plant operator where the producer gets, as his receipts, a price different from the price at which the plant operator sells the liquids, other than in this W. R. Davis situation? A. We have not found any other case, no.

"Q. The peculiarity of this situation, then, arises out of the peculiarity of the contract here involved? A. That's right.

"Q. Have you applied your principle in computing the tax any differently in this case than you have in the other 27 recycling plant situations in the State? A. No, we have applied exactly the same theory.

"Q. What is that theory? A. The theory is that we have interpreted the law literally; that the taxable value, regardless of what the producer receives, would be 3/5ths of the gross value, which we interpret to mean at the plant."

■ Thus there is no discernable discrimination or unjust taxation, where the same rule applies to all of the products extracted from the gas, and where the residue of the gas so treated had been returned to

the same producing formation in the ground, from whence the gas in its original wet state was produced.

On this feature, it seems reasonably inferable that the Legislature put this taxable value at 3/5 of the real value of the distillates, or products extracted from the natural gas, and left the other 2/5 to cover the expenses of the processing.

In other words, in recapitulation, this suit was a distinctive one based wholly upon a particular statute, the simple terms of which were prescribed upon; the State did not sue appellants as the producers of any gas, nor did it undertake the collection of any taxes on original gas as produced, but sued them only as purchasers of an agreed quantity of distillate, which was the sole product they had extracted from original gas, the residue of it having undisputedly been returned to the very land from which it came, through "intake wells" set up under contracts for that purpose between appellants and the original sellers and producers of the gas, Callaway et al.

So that, since the cause as so grounded, and developed on the trial by undisputed evidence, had to do only with taxes sought to be collected by the State from products extracted from gas processed, as indicated —that is, with what was determined to be distillates only—pursuant to Article 7047b and its subdivisions, as amended in 1941, it is deemed appropriate to here set out the segregated parts of that statute relating to such taxes, omitting the above-quoted "proviso" therefrom, as follows:

"Sec. 1. (1) There is hereby levied an occupation tax on the business or occupation of producing gas within this State, computed as follows:

"A tax shall be paid by each producer on the amount of gas produced in this State, * * * equivalent to five and two tenths (5.2) per cent of the market value * * *.

"The market value of gas produced in this State shall be the value thereof plus any bonus, or premium, or anything of value paid therefor, or any sum of money that such gas will reasonably bring if produced and sold in accordance with the law. * * * (see provision quoted supra).

"(2) The tax hereby levied shall be a liability of the producer of gas and it shall be the duty of each producer to keep accurate records in Texas of all gas produced, making monthly reports under oath as hereinafter provided.

"(3) The purchaser of gas shall pay the tax on all gas purchased and deduct the tax so paid from the payment due the producer or other interest holders, * * *.

"(4) The tax levied herein shall be paid monthly on the twenty-fifth day of each month on all gas produced during the calendar month next preceding by the purchaser or the producer as the case may be * * *.

"Sec. 2. (5) Gas shall mean natural gas * * * also productive oil, distillate and/or condensate, or other product.

"Sec. 2. (9) 'Report' shall mean any report required to be furnished in this Act or that may be required by the Comptroller in the administration of this Article. * * *

"Sec. 2a. (1) The tax herein imposed on the producing of gas shall be the primary liability of the producer as hereinbefore defined, and every person purchasing gas from producer thereof and taking delivery thereof at or near the premises where produced shall collect said tax imposed by this Article from the producer. * * *

"Sec. 3. The Comptroller shall employ auditors and/or other technical assistants for the purpose of verifying reports and investigating the affairs of producers and/or purchasers to determine whether the tax is being properly reported and paid, * * * and to promulgate and enforce, according to law, rules and regulations pertinent to the enforcement of this Article, which shall have the full force and effect of law. * * *

"Sec. 5. If any person shall violate any of the provisions hereof * * * the State shall have a prior lien for all delinquent taxes, penalties, and interest * * * and if any producer of gas shall fail to remit the proper taxes * * * the Comptroller may employ auditors or other persons to ascertain the correct amount due, and the producer of gas shall be liable, as an additional penalty for the reasonable expenses or the reasonable value of such services of representatives of the Comptroller, incurred in such investigation and audit * * *."

Appellants not only first purchased 1/2 of the original gas so produced by Callaway and others, the sellers, and paid therefor by its service in processing the other 1/2 for such sellers, but they further "purchased the sellers' one-half interest in the distillate at Alice, which was produced dur-

ing May, 1941, at $1.36 per barrel, and for the remaining time each month from May through January, 1942, at $1.44 per barrel. Appellants sold all of the distillate at Corpus Christi during those months at prices ranging from $1.90 to $2.25 per barrel. The cost of transporting it from Alice to Corpus Christi was a total of 8½ cents per barrel.

"Appellants, W. R. Davis & Company, made a monthly report to the Comptroller, and paid the occupation tax, as provided for in Article 7047b on the distillate that it produced from the original gas, based on what it paid the sellers each month for their one-half interest therein at Alice, Texas, namely, $1.36 for that produced in May, and $1.44 per barrel for all produced each month thereafter.

"Appellee, the State of Texas contends that the appellants should have paid the tax provided for in such statute on the basis of what it sold such distillate for at Corpus Christi, less the 8½ cents per barrel, which it cost to transport same from Alice to Corpus Christi."

The trial court's judgment, in effect, adopted the State's theory of its rights against appellants as so based, hence the final result declared by it in dollars and cents.

This court is unable to sustain any of appellants' attacks thereon, upon these among other considerations:

(1) That the undisputed evidence is legally sufficient to sustain that court's valuation upon the distillate products involved, the quantities of which were not in dispute;

(2) That the "gross value" of such products was the price received by appellants therefor at Corpus Christi, less the actual cost of transporting them there from Alice, where the wet or original gas—unprocessed—was shown to have had no salable value whatever;

(3) That the trial court, under the plain and detailed provisions of amended Article 7047b, as quoted supra, did not err in holding that those provisions required this processed distillate to be taxed on a basis of 3/5 of the gross value thereof, which, by the mutual concession in their briefs of both sides here, was the same thing as its market value;

(4) That there was likewise, as before recited, sufficient if not conclusive evidence sustaining the further · finding that such

gross value of the distillate was the price received therefor by the appellants at Corpus Christi, less the · indicated expenses in transporting it there from the recycling plant at Alice.

This decision is expressly limited, as in the beginning pointed out, to the questions of law necessarily arising upon the facts involved. These conclusions require an affirmance of the judgment; it will be ordered.

Affirmed.