# W. R. DAVIS, INCORPORATED, ET AL. V. STATE OF TEXAS.

No. A-54.   Decided May 3, 1944.
Rehearing overruled June 14, 1944.
(180 S. W., 2d Seriees, 429)

*L. W. Graves, Jr.,* and *Taliaferro, Graves, Hutcheson & Fahey,* all of Houston, for petitioners.

The court erred in holding that the gross value of the distillate involved was the price received by the defendants at Corpus Christi, less transportation and shrinkage, as the value received by the defendants, petitioners here, at Corpus Christi, was not proof of the value at Alice, Texas, and vice versa. 17 Texas Jur. 175; 31 C. J. S. 901; Livingston Oil Corp. v. Waggoner, 273 S. W. 903.

*Grover Sellers*, Attorney General, *Geo. W. Blackman, Fowler Roberts, Ocie Speer*, and *Geo. W. Barcus*, Assistants Attorney General, for respondent.

The value of the distillate as fixed by the trial court is abundantly supported by the evidence. Kerr v. Blair, 105 S. W. 548; Dale Oil & Refining Co. v. City of Tulia, 25 S. W. (2d) 671.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This suit was filed in the District Court of Travis County, Texas, by the State of Texas against W. R. Davis, Inc., a dissolved corporation, and James Lee Kaufmann, executor of the will and estate of W. R. Davis, deceased, to recover occupation taxes, interest, and penalties, and an auditor's fee alleged to be due the State under applicable provisions of "Article II," page 276 et seq., Acts 47th Leg., 1941, carried as Article 7047b, Vernon's Texas Civil Statutes. Trial in the district court resulted in a judgment for the State in the aggregate sum of $6,809.44. This sum is made up of taxes found to be due the State, 10% penalty thereon, 6% interest from the time the tax was found to be due to the date of judgment, and an auditor's fee of $80.00. This judgment was affirmed by the Court of Civil Appeals. 176 S. W. (2d) 978. Davis et al. bring error.

For convenience we will hereinafter refer to the parties as the State and as Davis.

The pertinent facts involved in this case seem to be undisputed. Earl Callaway and some eighty others (a few were royalty owners only) were producers of gas at Alice, Texas, as the term "producer" is defined in Article 7047b, supra. Davis contracted with such producers to process the gas produced by them. By the terms of this contract Davis was given one-half of the gas products or distillate derived from the gas produced by the producers, and the producers retained the other one-half. Davis obligated himself to return through "intake wells" provided by the eighty-one producers the left-over gas,

or residue gas, to the same gas-producing formation underlying the lands from which it had originally been taken.

Davis purchased from the eighty-one producers all of their one-half interest in the gas products, or distillates, extracted from the gas here involved. As we understand this record, he paid the producers in money for the one-half of such distillates retained by them under the above contract. The other one-half of the distillates was given to Davis for extracting such distillates from the original raw gas and returning the residue gas to the producing lands.

Davis paid the eighty-one gas producers for their one-half of the distillate purchased during May, 1941, at $1.36 per barrel, and for the remaining time here involved the sum of $1.44 per barrel. Davis paid all taxes on all the distillate produced and saved, computed at a value the same as the price paid by him to the producers. We assume that Davis made proper deductions for taxes paid from the amounts he paid the respective producers. We think we are justified in further assuming that the prices paid were satisfactory to such producers. Davis' contract with the producers obligated him to pay one-half the taxes imposed by this Act.

After purchasing this distillate from the eighty-one producers at the consideration and prices above indicated, Davis transported it by pipe line from Alice, Texas, to Corpus Christi, Texas, where he sold it at prices ranging from $1.90 to $2.25 per barrel. The State here sues Davis for occupation taxes levied by the above-mentioned statutes, computed at the prices received by him at Corpus Christi, Texas, less the cost of transportation. The State contends that such was the market value of such distillates at Alice, Texas, within the meaning of the above statute. The district court awarded judgment for the State against Davis in accordance with the State's contention.

Before proceeding further we deem it necessary to quote and discuss certain portions of the Act made the basis of this suit, being Article 7047b, supra.

■ The first paragraph of Subdivision (1) of Section 1 of the above-mentioned Article levies an occupation tax on the business or occupation of producing gas within this State, to be computed as in the Act provided. This provision of the Act in no uncertain language levies the tax against the producer of gas, and not the purchaser thereof.

The second paragraph of Subdivision (1) of Section 1 of the Act here involved provides that the producer shall pay a tax on all gas produced and saved within this State equivalent to 5.2 per cent. of the market value thereof as and when produced.

The fourth paragraph of Subdivision (1) of Section 1 of this Act provides that the market value of gas produced in this State shall be "the value thereof plus any bonus, or premium, or anything of value paid thereof, or any sum of money that such gas will reasonably bring if produced and sold in accordance with the laws, rules and regulations of this State, * * * ." This paragraph then provides that "where gas is processed for its liquid hydrocarbon content and the residue gas is returned by recycling methods to the same gas-producing formation underlying the land from which the gas is produced, the taxable value of such gas shall be three fifths (3/5) of the gross value of all products extracted, separated and saved from such gas."

Subdivision (2) of Section 1 of this Act specifically provides that the tax levied by such Act shall be the liability of the producer of gas, and it shall be his duty to keep accurate records thereof and make monthly reports under oath as hereinafter provided. This subdivision clearly makes the producer, not the purchaser, the one primarily liable to the State for the tax levied by this Act.

Subdivision (3) of Section 1 provides that the purchaser of gas shall pay the tax on all gas purchased, and deduct the tax so paid from the payment due the producer or other interest holders. This subdivision then provides that the money so deducted from the payments due producers for the payment of taxes shall be held by the purchaser in trust for the State, and shall not be commingled with any other funds held by such purchaser.

Subdivision (4) of Section 1 of this Act provides that the tax levied by this Act shall be paid monthly on the 25th day of each month on all gas produced during the calendar months next preceding by the purchaser or producer, as the case may be, but in no event shall the producer be relieved of responsibility for the tax until same shall have been paid. This subdivision then provides, "in the event the amount of the tax herein levied shall be withheld by a purchaser from payments due a producer and said purchaser fails to make payment of the tax to the State as provided herein the producer may bring

legal action against such purchaser to recover the amount of tax so withheld, together with penalties and interest which may have accrued by failure to make such payment and shall be entitled to reasonable attorney's fees and court costs incurred by such legal action."

Subdivision (5) of Section 1 provides for a ten per cent. penalty for failure to pay any taxes due under this Act by the date they are due. Also, this subdivision makes provision for the payment of six per cent. interest.

Subdivision (1) of Section 2 of this Act defines what is meant by "producer." This definition is very important, because it is the producer who is made primarily liable to pay this tax, and he must ultimately bear the burden thereof. So far as pertinent to this case a "producer" is defined as any person who produces gas in any manner by taking it from earth, and any person owning any royalty in gas.

Subdivision (1) of Section 2a provides that the tax imposed by this Act on the producing of gas shall be the primary liability of the producer as hereinbefore defined, and every person purchasing gas from the producer thereof, and taking delivery thereof at or near the premises where produced, shall collect said tax imposed by this Article from the producer. Of course, such collection is made by withholding the amount of the tax from the purchase price.

Subdivision (4) of Section 2a of this Act provides that the tax hereby levied shall be paid by the first purchaser purchasing the same from the producer, who will deduct the same from the amount paid the producer. This subdivision then provides that the failure of the first purchaser to pay said tax shall not relieve the producer from the payment of same, nor shall it relieve any subsequent purchaser from the payment of same, where the first purchaser does not account for and pay said tax, and it shall be the duty of every person purchasing gas produced in Texas to satisfy himself or itself that the tax on said gas has been or will be paid by the persons primarily liable therefor.

Section 3 of this Act provides that the Comptroller may employ auditors and other technical assistants for the purpose of verifying reports and investigating the affairs of producers and purchasers, to determine whether the tax is being properly reported and paid.

Section 4 of this Act provides for injunctions against the persons engaged in the business of producing gas in this State, who become delinquent in the payment of the taxes imposed by this Act.

Section 5 of this Act provides for a penalty for the violation of this Act, of not less than $100.00 for each violation, and each day's violation is made to constitute a separate offense. This section also provides that the Comptroller may employ auditors or other persons to ascertain the correct amount of taxes due by any person under this Act, "and the producer of gas shall be liable, as an aditional penalty, for the reasonable expenses or the reasonable value of such services of representatives of the Comptroller, incurred in such investigation and audit; * * * ."

■ Section 3 of this Act makes provision for the making by the Comptroller of full investigations of both purchasers and producers. Such section also empowers the Comptroller to employ auditors and other persons proper and necessary to accomplish such investigations. Also, this section provides a fund to defray the expenses so incurred. Section 5 provides for the recovery of reasonable fees for auditors and investigators employed by the Comptroller as against producers. The statute under investigation nowhere contains any authority for collecting such fees as against purchasers. It follows that the $80.00 auditor fee allowed in this judgment as against Davis is wholly without authority of law.

Subdivision (3) of Section 1 of this Act levies an occupation tax against the producers of gas. It levies absolutely no tax of any character against purchasers. The only connection a purchaser has with such tax is to act as the agent of the State in collecting it from the producer and paying it over to the State, accompanied with proper reports pertaining thereto.

The purchaser collects the tax from the producer by deducting the amount thereof from the amount of the purchase price. It is then made the duty of the purchaser to hold the sum deducted as a trust fund, and not commingle it with any other funds. It is the amount deducted that is made a trust fund, and it is the trust fund that must not be commingled with the purchaser's other funds. A reading of the part of this statute last above mentioned would certainly make the purchaser liable to the State for the tax levied by this Act against the producer, computed on the value as represented by the price paid to the

producer therefor. Certainly this portion of the Act does not contemplate that the purchaser shall pay the producer one price, deduct the tax due the State at that price, keep the tax at that price segregated, and then pay the State a tax at another price.

By the provisions of the second paragraph of Subdivision (1) of Section 1 of this Act it is provided that the producer shall pay a tax of 5.2 per cent. on all gas produced and sold by him in this State, computed on the "market value" thereof. This provision of the statute makes "market value" the standard on or by which the tax due by the producer to the State must be computed. Such being true, it is the standard that the purchaser must use in computing the amount he is required to withhold from the purchase price due by him to the producer. If we can determine what is meant by "market value," we will have determined the basis for computing this tax. The difficulty arises when we come to determine what is meant by the term "market value" as that term is used in the subdivision last above mentioned.

It is very evident that the Act does not use the term "market value" in its ordinary legal sense. This is because Subdivision (1) of Section 1 defines the term. The portion of the Act just mentioned defines "market value" as "the value thereof plus any bonus, or premium, or anything of value paid therefor, or any sum of money that such gas will reasonably bring if produced and sold in accordance with the laws, rules and regulations of this State, * * * ." When this definition is read as a whole it is reasonably clear that it contemplates that "market value" is the price for which the producer sells his gas. This construction of the definition "market value," contained in the statute, is the only one that can be indulged in and give any meaning whatever to the statutory definition. The statute says "market value" shall be "the value thereof plus any bonus, or premium, or anything of value paid therefor, or any sum of money that such gas will reasonably bring if produced and sold" etc. This definition, read as a whole, and construed from its four corners, means that the total sale price is the amount on which the tax levied by this Act must be computed. Any other construction of this definition would destroy it. This must be true, because the very statutory definition adds to the value of the gas the value of everything that the producer may get for it in addition to such value. Evidently it was not the intention of the Legislature to have more than one standard of value, and such would be the case if it were held that in some instances "market value" in the ordinary meaning of that term is meant,

while in other instances the sale price is meant if the producer sells for more than the "market value."

The construction we have given the term "market value" as used in this statute is further strengthened by the fact that all taxes levied by this Act fall ultimately on the producer, and any amount recovered by the State against a purchaser which is more than such purchaser has reserved from the producer out of the purchase price is an ultimate liability of the producer to the purchaser. Of course, the statute contemplates that the purchase contract between the purchaser and the producer shall be a good faith agreement and free from fraud and collusion as regards the State's claim for the taxes under this Act. When we view this Act as a whole, and especially when we consider the definition of "market value" therein contained, we are convinced that it demonstrates a clear legislative intention to make the good faith sale price by the producer to the initial purchaser the standard of value on which the purchaser's liability to the State for taxes must be computed. Of course, the purchaser can never be liable for any greater tax than the producer is liable for, because, as already shown, the statute levies the tax against the producer, and against him only. Beyond a doubt the purchaser who pays the tax has the right to recoup himself from the producer. The purchaser is merely the withholding agent of the State. Canadian River Gas Co. v. Bivens, 137 Tex. 347, 153 S. W. (2d) 434.

■ Davis contends that this statute is unconstitutional and void if it be given the construction that it compels the purchaser to act as the agent of the State in withholding the amount of taxes due by the producer from whom he purchases, and then compels the purchaser to be liable to pay the producer's taxes to the State, computed on so uncertain and unliquidated a thing as what a trial court or jury might thereafter find was the market value of the gas purchased, using the term market value in its ordinary meaning. If this statute should be given such construction its constitutionality would be, to say the least, very doubtful. The construction we have given it renders its constitutionality free from doubt.

So far as is pertinent here, Sec. 35 of Art. III of our State Constitution provides:

"No bill * * * shall contain more than one subject, which shall be expressed in its title, * * * ."

In the record in this case we find a brief filed by J. S. Abercrombie Company, by its attorneys. In this brief it is contended

that the part of Article II of this Act which levies an occupation tax on the occupation of refining liquids from gas violates the above constitutional provision, because the subject of such an occupation tax is not contained in its caption. We think the Act is not subject to this objection, because the occupation of refining liquids from gas is not therein taxed. It is true that the Act provides that "where gas is processed for its liquid hydrocarbon content and the residue gas is returned by recycling methods to the same gas-producing formation underlying the land from which the gas is produced, the taxable value of said gas shall be three fifths (3/5) of the gross value of all the products extracted, separated and saved from such gas," but such quoted provision merely provides the method of ascertaining the value of the original gas, and the producer thereof only is taxed, not the refiner.

The judgments of the Court of Civil Appeals and district court are both reversed, and this cause is remanded to the district court for a new trial.

Opinion delivered May 3, 1944.

Rehearing overruled June 14, 1944.