**MOBIL OIL CORPORATION, Appellant,**

v.

**Robert S. CALVERT et al., Appellees.**

**No. 11691.**

Court of Civil Appeals of Texas.

Austin.

July 2, 1969.

Rehearing Denied July 23, 1969.

J. C. B. Aler, W. H. Tabb, W. F. Smith, Dallas, for appellant.

Crawford C. Martin, Atty. Gen., Nola White, 1st Asst. Atty. Gen., Hawthorne Phillips, Exec. Asst. Atty. Gen., W. V. Geppert, Staff Legal Asst. Atty. Gen., John R. Grace, Alfred Walker, Fisher Tyler, J. H. Broadhurst, Asst. Attys. Gen., for appellees.

PHILLIPS, Chief Justice.

This case presents questions as to the amount of tax due Appellee Comptroller in three different types of gas operations involving the Appellant.

The first situation involves the production and sale of gas from unitized fields where Appellant pays the royalty owners' share of processing charges; the second involves the production of gas, a portion of which is returned for use as lease use gas; the third involves the production and processing of gas at a processing plant which is owned by several affiliated plant owners including Appellant.

Each of the three operations was subjected to additional assessments of gas production taxes. This suit is for the recovery of taxes, penalty and interest paid by Appellant to the State Comptroller of Public Accounts under protest, which taxes are levied on producers of natural gas as provided by Chapter 3, Title 122A, Taxation-General, Vernon's Civil Statutes. The trial court sustained Appellees' position on the assessment of each of the three operations with the exception of penalties and interest on the third operation.

We sustain the judgment of the trial court with respect to questions one and three and reverse and render with respect to question number two.

Appellant is before us on three points of error the first being that of the trial court in refusing to hold that the gross production tax on the royalty owners' interest in the gas is measured by ⅛ of the amount for which Appellant sold such gas.

As stated, Appellant's point number one requires clarification. In any event, we overrule it.

Appellant and its predecessors in interest executed several oil and gas leases in the Pegasus and Seeligson Fields of Texas. With only minor variations the royalty clauses of such leases read as follows:

"The royalties to be paid by Lessee: * * * (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; * * *"

Royalties were paid in accordance with the formula set forth in these provisions. The Gas Production Tax was computed and paid in connection with gas in which the royalty owners owned an interest on the basis of Appellant's net sales price of the raw gas. Appellant's net sales price was determined by deducting from the total sales price the cost of gathering, transportation, etc. The deductions were made to determine the market value of the gas at the mouth of the well when and as produced. Appellees did not disagree with this procedure.

The natural gas produced from these fields was rich in valuable, liquefiable hydrocarbons. Appellant constructed a processing plant in the Pegasus Field for the purpose of stripping the hydrocarbons from the raw gas. The liquefied hydrocarbons and remaining residue gas were sold at the tail gate of the processing plant. Royalty owners were required to bear ⅛ of the charges for processing the gas produced under the above mentioned lease agreements. The Gas Production Tax was computed and paid on such gas by deducting from the sales price of the extracted hydrocarbons and residue gas all of the expenses above listed as well as the cost of operating the processing plant. The Comptroller did not disagree with this procedure.

Subsequently, each of the two fields were separately unitized giving rise to the legal necessity of entering into Unitization and Royalty Owners' Agreements. Operations and procedures continued exactly as under the oil and gas leases except insofar as such agreements demanded modification.

One such modification gave rise to the litigation under Appellant's first point.

As a condition to their executing the Royalty Owners' Agreements, the royalty owners were able to successfully demand that the working interest owners, including Appellant, undertake the entire plant processing charge, $\frac{1}{8}$ of which was originally borne by the royalty owners while operations were conducted under the leases. Thus, the royalty owners were able to and did receive more money than they did under the leases from the sale of the same amount of processed gas. Conversely, Appellant and all other working interest owners retained less money than they did under the leases from the sale of that same amount of processed gas. Nevertheless, Appellant's sales price for the products and residue gas remained the same.

Regardless of the fact that the sales price did not increase, the Comptroller increased the amount of tax due on the grounds that the royalty owners began to receive more money under the Agreements than they did under the leases. Significantly, there was no comparable deduction in the amount of tax due from Appellant even though it retained a lesser portion of the sales price because it had to pay an additional one-eighth of the processing charges under the Agreement. Appellant contends that, since its sales price for the gas did not change, the tax should not have been increased.[1]

1. An example of positions taken by the parties, using hypothetical figures, is as follows:

"STATE'S THEORY:

| | |
|---|---|
| Value of gas after processing | $1600 |
| Cost of processing | 800 |
| Royalty owner gets ⅛ of $1600 | $ 200 |
| Rate of tax | 7% |
| Tax on Royalty owner's part | $ 14 |
| Mobil's ⅞ interest of $800 | $ 700 |
| Rate of tax | 7% |
| Tax on Mobil's ⅞ interest | $ 49 |
| Royalty owner's tax | 14 |
| Total tax due State | $ 63 |

APPELLANT'S THEORY:

| | |
|---|---|
| Value of gas after processing | $1600 |
| Cost of processing | 800 |
| Value of ⅞ of gas at well | $ 800 |
| Rate of tax | 7% |
| Total tax due State | $ 56 |
| Amount paid royalty owner | $ 200 |
| Rate of tax | 7% |
| Royalty owner's part of tax | $ 14 |
| Total tax due | $ 56 |
| Royalty owner's part of tax | 14 |
| Appellant's part of tax | $ 42 |

| | |
|---|---|
| State's theory—total tax due | $ 63 |
| Appellant's theory—total tax due | 56 |
| Difference | $ 7" |

## I.

Appellant's first point, as stated, is somewhat obscure in that there has never been any argument between the parties hereto as to the amount of tax owed by the royalty owners and, it has been stipulated between the parties that Appellant withholds the royalty owners' portion of the gross production tax based upon the total amount paid to the royalty owners.

The principal question at issue here is the basis of calculating the amount of tax due on the ⅞ interest of the Appellant. Appellant maintains that there has only been one sale of gas and that is the amount brought for the entire ⅞; that the legislature did not intend that the gas be taxed at an amount in excess of its sale price. That the Comptroller and the trial court have disregarded the mandate of Article 3.03(5) that the tax shall be borne ratably by the parties. This section reads as follows:

"The tax herein levied shall be borne ratably by all interested parties, including royalty interests; and producers and/or purchasers of gas are hereby authorized and required to withhold from any payment due interested parties, the proportionate tax due and remit the same to the Comptroller."

Appellant further argues that Tex.Rev.Civ. Stat.Ann. art. 3.02, copied below, requires that the tax be computed on the basis of the market value of the gas which is defined to mean the sale price thereof, that is, the price received from the entire ⅞, each of the parties (royalty and working interest) bearing the tax (ratably) on their portion of the sales price.

It is the contention of the State of Texas that there are two separate taxing interests involved, namely the ⅛ interest of the royalty owner, based on the amount of money received by the royalty owner for his ⅛ of the gas, and the ⅞ of the gas to which the lessee is entitled, based upon the total sale price of the ⅞ after processing,

less the cost of processing the ⅞, and not less the cost of processing the total ⅞ as contended by Appellant. It is the State's contention that there are two separate taxing interests and each must be figured independently of the other.

It is the contention of the State of Texas that the royalty owner has a taxable interest in the ⅛ royalty interest regardless of who has the naked legal title to the ⅛ of the gas, and that Appellant has a taxable interest in the remaining ⅞ of the gas produced, and to determine the value of the ⅞ at the mouth of the well, the total sale price of the finished product after processing less the cost of the processing of the ⅞ interest becomes the taxable value of the ⅞ interest at the mouth of the well.

Tex.Rev.Civ.Stat.Ann. art. 3.02 provides in part as follows:

"(1) The market value of gas produced in this State shall be the value thereof at the mouth of the well; * * *. In all cases where the whole or a part of the consideration for the sale of gas is a portion of the products extracted from the producer's gas or a portion of the residue gas, or both, the tax shall be computed on the gross value of all things of value received by the producer, including any bonus or premium; * * *."

Tex.Rev.Civ.Stat.Ann. art. 3.04, Title 122A, provides in part:

"(1) For the purpose of this Act 'producer' shall mean any person owning, controlling, managing, or leasing any gas well and/or any person who produces in any manner any gas by taking it from the earth or waters in this State, and shall include any person owning any royalty or other interest in any gas or its value whether produced by him, or by some other person on his behalf, either by lease, contract, or otherwise.

*    *    *    *    *    *

(13) 'Royalty owners' shall mean and include all persons owning any mineral rights under any producing leasehold

within this State, other than the working interest, which working interest is that of the person having the management and operation of the well."

Appellant insists that it is fundamental to Appellees' position that subsequent to production the royalty owner sold one-eighth of the gas to Appellant; but, that under Texas law no such sale could have taken place. Appellant then cites cases[2] to the effect that royalties paid for gas are not paid for the gas itself but for the use of the land. Since the royalty is not paid for gas, there was no sale of the gas to the producer after production. Consequently, contrary to the position held by the State, no sale occurred from the royalty owner to the Appellant. That the language of Article 3.02 contemplates only one sale, the market value thereof being the amount received by the producer (including royalty owners by definition) either in cash or the gross value of returned products. And that the tax is computed on this one amount.

We do not agree with this contention.

The Gas Production Tax is an occupation tax levied on each "producer," with respect to his separate interest in the gas production. The tax is not levied on the gas itself. It is not the gas or its total value, as such, which stands for taxation; but rather the law charges each producer equally standing before the taxing authority, measuring his tax liability by what he received for his separate interest in the gas production. Group No. 1 Oil Corp. v. Sheppard, 89 S.W.2d 1021 (Tex.Civ.App. Austin 1935, error ref'd.).

The tax is levied at the time the gas is produced or captured, and the tax on each producer relates to that time. The tax is not limited to or measured by the amount for which the total volume of gas sells, but rather it is measured by the amount each producer (which by definition includes

royalty owners, Tex.Rev.Civ.Stat.Ann. art. 3.04(1) ) receives for his separate interest. Sheppard v. Stanolind Oil & Gas Co., 125 S.W.2d 643 (Tex.Civ.App. Austin 1939, writ ref'd.).

Appellant's interest in the gas at the time of production is seven-eighths, and the royalty owners' interest is one-eighth. Both of them are producers within the definition contained in the tax statute in question; therefore, the royalty owner is taxed on the amount he receives for his one-eighth interest, and Appellant is taxed on the amount it receives for its seven-eighths interest.

When the gas is sold, the value of each separate taxable interest, as related to the time of production, is measured by the amount for which that particular separate interest is sold, with the necessary expenses of transporting and marketing that interest being deducted from the sales price so as to arrive at its value at the mouth of the well.

Irrespective of the polemics of title to the royalty owners' interest in the gas, Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021 (Tex.1934) held that a royalty interest in oil and gas in place was such an interest as could be taxable for ad valorem purposes. An occupation tax on producers is equally collectible at the well head. Group No. 1 Oil Corp. v. Sheppard, supra.

Appellant contends, further, that the additional concession demanded and obtained by the royalty owners (that is, the requirement that Appellant would pay the processing plant charges for all of the gas including the ⅛ of the charges which was originally paid by the royalty owners) was not an increased payment to them but was merely an inducement to them to enter into the agreement. That this fact was stipulated to between the parties due to the following statement in the stipulations: "Pur-

2. Griffith v. Taylor. 156 Tex. 1, 291 S.W. 2d 673 (1956) ; Republic Building and Loan Ass'n v. Simpson, 77 S.W.2d 1101

(Tex.Civ.App. El Paso 1935, writ dism'd) ; Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

suant to the execution of the Royalty Owners' Agreement, plaintiff altered, in one respect, its method of calculating the amounts due to royalty owners even though the fractional amounts due to them was not changed by the agreements * * * such change having been conceded as an inducement to the royalty owners in consideration for their executing the Royalty Owners' Agreements. The parties agree that under the Royalty Owners' Agreements the royalty owners are paid more money than under the lease agreements upon the production of the same amount of gas by virtue of the fact that plaintiff must bear the entire expense of gathering, compression, transportation, etc. * * *"

■ We disagree with this premise. Under the occupation tax before us, the incidence of the tax does not fall upon the producers' (royalty owners') share of the gas but upon "the gross value of all things of value received by the producer, including any bonus or premium" (Tex.Rev.Civ.Stat. Ann. art. 3.02). He receives greater value under the new agreement; consequently, he owes more taxes. The same applies to the gross value received from Appellant's sale even though its costs have increased.

This result follows from the language of this Court in Group No. 1 Oil Corporation, supra, as follows:

"It is also manifest that the tax is not dependent upon the character of title under which the producer produces the oil. Nor is the tax levied on the oil in place. The tax is levied on the business or occupation of producing the oil. * * * and it would seem that the source or character of title would have nothing to do with the nature of the occupation or business, and such matters are irrelevant with respect to the purpose of the taxing act." Citing cases.

## II.

Appellant's point of error number two is that of the trial court in refusing to hold that the market value of lease use gas was the amount Appellant would have received from its sale of such gas, rather than the amount that the plant owner would have received from his sale of such gas, had it been sold rather than used.

We sustain this point.

Under this operation, Appellant was a producer but not a plant operator. The independent processing plant operators who purchased raw gas from Appellant ordinarily sold the residue gas to a pipeline company after stripping out the liquefiable hydrocarbons. The contractual purchase price for the raw gas was a percentage of the amount the plant operator received from his sale of the residue and hydrocarbons. However, a large amount of the equipment and machinery found on Appellant's leases was operated by residue gas. Appellant had, under its agreements with the third party processing plant operators, the right to have returned to it a certain percentage of the residue gas for such purpose. There was no additional charge imposed for such returned gas.

If such gas had been sold by the plant operator, Appellant would have received the contractual percentage of the sales price and that would have been the market value of such gas for tax purposes. But since the gas was returned to Appellant for lease use, the trial court held that its market value was the amount for which the gas could have been sold by the plant operator. That amount is, of course, not only equal to the percentage which Appellant would have received had the gas been resold, but to the entire amount for which the gas could have been sold by the plant operator. In other words, the trial court determined that the market value of such gas was increased by virtue of its having been returned as lease use gas rather than having been resold by the plant operator.

■ We hold that Appellant's analysis is correct and that the amount Appellant would have received from its sale of such

gas, rather than the amount that the plant owner would have received from its sale of the gas, was the market value of the gas sold. This same value applied to the gas returned to Appellant for use.

Tex.Rev.Civ.Stat.Ann. art. 3.02 states the market value of gas as being the amount received by the producer from its sale, whether in terms of cash or returned products. The State computed the market value of the gas on the amount which the plant operator would have received had the gas been resold by him rather than returned for lease use.

By this construction of the statute we are following the reasoning of the Supreme Court in W. R. Davis, Inc. v. State, 142 Tex. 637, 180 S.W.2d 429 (1944) where under a set of facts somewhat similar to the case before us, the Court in construing old Tex.Rev.Civ.Stat. art. 7047b (the source for Article 3.02) stated:

"When this definition is read as a whole it is reasonably clear that it contemplates that 'market value' is the price for which the *producer* sells his gas. * * * This definition, read as a whole, and construed from its four corners, means that the total sale price is the amount on which the tax levied by this Act must be computed. Any other construction of this definition would destroy it. This must be true, because the very statutory definition adds to the value of the gas the value of everything that the *producer* may get for it in addition to such value. Evidently it was not the intention of the Legislature to have more than one standard of value, and such would be the case if it were held that in some instances 'market value' in the ordinary meaning of that term is meant, while in other instances the sale price is meant if the producer sells for more than the 'market value.'

* * * When we view this Act as a whole, and especially when we consider the definition of 'market value' therein contained, we are convinced that it demonstrates a clear legislative intention to

make the good faith sale price *by the producer to the initial purchaser* the standard of value on which the purchaser's liability to the State for taxes must be computed.

* * * but such quoted provision merely provides the method of ascertaining the value of the *original* gas, and the producer thereof only is taxed, not the refiner." (Emphasis added)

We reverse the judgment of the trial court with respect to this point and render judgment thereon.

### III.

Appellant's point of error number three is that of the trial court in refusing to rule that the market value of gas produced and processed by Appellant is measured by the percentage of products returned to non-affiliated producers at other processing plants in the area.

We overrule this point.

In the Seeligson Field, Appellant is a producer of gas as well as the processing or cycling plant operator. Other producers in the field own an interest in the processing plant and are referred to as "affiliated plant owners." No gas is processed for other than affiliated plant owners. The processing agreement between the processing plant (known as the Seeligson Plant) and the affiliated plant owners provides that the plant will retain a percentage of the liquefied hydrocarbons obtained from processing and return the remainder of the liquefied hydrocarbons to the affiliated plant owners. According to Tex.Rev.Civ. Stat. Art. ann. 3.02 the market value of such gas is the gross value of all things received by the producers. But, probably because of the historically close relationship between affiliated plant owners, the Comptroller has ruled for many years that such gross value may not be taken as the true market value of the products. The Comptroller's ruling is contained in Instruction 3b of the 1.51 Cycling Report which must

be filed by the Seeligson Plant owners along with the tax. That instruction reads as follows:

"3. Barrels from severed gas are valued as follows:

b. When the plant operator is also the producer of the gas, the tax shall be computed on the 'Market Value' of additional liquids produced, as determined by contract between other cycling plant and non-affiliated producers, in the same area, except that tax is to be paid on 100% value of the condensate."

Appellant complied with the precise terms of Instruction 3b by adopting as the market value of its gas which it processed through its plant the percentage of products returned by the La Gloria Plant which was the only other processing plant in the area. Nevertheless, the Comptroller determined in its audit that since the percentage of hydrocarbons returned by the Seeligson Plant to affiliated plant owners was greater by approximately 5% than the percentage returned by the La Gloria Plant to non-affiliated plant owners, the Seeligson percentage must be used in computing the market value of the gas. The Comptroller's deviation from the terms of Instruction 3b was approved by the trial court and gave rise to the appeal on this point.

Appellant maintains that the administrative requirement of Instruction 3b is not contrary to the statute and follows closely the legislative intent in enacting Article 3.02. That the instruction may be necessary in preventing evasion of the tax and recognizes the difficulty in calculating the market value of gas under contracts between parties who are affiliated in the ownership of a processing plant. That the Comptroller had promulgated and required compliance with the Instruction for almost fifteen years and that this administrative determination should be given great weight here.

The law pertinent to this question is that part of Tex.Rev.Civ.Stat.Ann. art. 3.02, Title 122A, Taxation-General, which reads as follows:

" * * * In all cases where the whole or a part of the consideration for the sale of gas is a portion of the products extracted from the producer's gas or a portion of the residue gas, or both, the tax shall be computed on the gross value of all things of value received by the producer, including any bonus or premium; * * *."

It is stipulated that Appellant has as operator of the processing plant returned to itself, as a producer, 60% of the liquid hydrocarbons removed during the processing operation at the Seeligson Plant, and retained 40% thereof as consideration for processing such gas. The Appellant contends that the Instruction 3b above is controlling in this matter as to the method of figuring the tax on the amount of gas involved in this question.

■ Tex.Rev.Civ.Stat.Ann. art. 3.02 of Title 122A, is controlling and is very plain and therefore there can be no question as to the method to be used in figuring the tax on the production of this gas. Appellant agrees that they received the value of 60% of the processed gas and so long as there is no contention of fraud then the provisions of Article 3.02 are applicable regardless of what may have happened at another plant in the same general area.

The judgment of the trial court is affirmed in part and reversed and rendered in part.

Affirmed in part and reversed and rendered in part.

HUGHES, Justice (dissenting).

I respectfully dissent from the Court's disposition of appellant's first point. It is my opinion that only one taxable sale of gas occurred and that the amount received from that sale is the sole taxable figure and

that the tax on this sale price should be prorated between all interested persons.

It was stipulated that under the leases held by appellant that royalty under them is paid in cash and that royalty owners are not entitled to take a portion of the gas in kind.

It was also stipulated that the agreement on the part of appellant to pay all the processing cost of the gas was "conceded as an inducement to the royalty owners in consideration for their executing the Royalty Owners' Agreements." These agreements were unitization agreements. Thus it appears highly questionable that the consideration for the agreement was the sale of gas. The same financial result could have been achieved by appellant granting its royalty owners a larger proportion of the gas produced. Under the base example set out in the Court's opinion if the royalty paid to the landowner was increased from $\frac{1}{8}$ to $\frac{1}{4}$ these would be the results:

| "Value of gas after processing | $1,600 |
| Cost of processing | 800 |
| Market value at the well | $ 800 |
| Royalty owner gets $\frac{1}{4}$ of $800 | $ 200 |
| Rate of tax | 7% |
| Tax on royalty owner's $\frac{1}{4}$ interest | $  14 |
| Mobil's $\frac{3}{4}$ interest of $800 | $ 600 |
| Rate of tax | 7% |
| Tax on Mobil's $\frac{3}{4}$ interest | $  42 |
| Royalty Owner's tax | 14 |
| Total tax due State | $  56 " |

---

There would seem to be no question under this hypothetical case but that the tax would be only $56. To hold as the Court does here is to prefer form over substance.

My real basis for dissent is, as stated, that only one sale of gas has occurred. That sale was made by appellant and it was a sale of all the gas it produced and it *produced* all of the gas. It is true that a royalty owner is *classified* as a producer of gas for tax purposes but as plainly stated in Art. 3.04, Title 122A, Sec. (1) Taxation-General,[1] a "producer" is a "producer" whether gas is produced by him or by his lessee. The royalty owners here produced no gas. It was all produced by appellant.

Art. 3.01, Sec. (1), provides that a tax "shall be paid by each producer on the amount of gas produced and saved," and Art. 3.04 Sec. (11) provides:

" 'Production' or 'total gas produced' shall mean the total gross amount of gas produced including all royalty or other interest; that is, the amount for the purpose of the tax imposed by this Article shall be measured or determined by meter readings showing one hundred per cent (100%) of the full volume expressed in cubic feet."

Art. 3.03(1) provides that the tax shall be a liability of the producer of gas and makes it the duty of each such producer to keep accurate records of "all gas produced."

Obviously, it is the lessee, not the owner of royalty, upon whom the legislature has imposed the burden of keeping accurate records of the 100% of the full volume of

1. All statutory references are to this Title.

the gas produced and saved, including royalty.

Thus, it seems to me, that the statutes themselves refute the contention that the royalty owner and the owner of the working interest are two separate and independent taxable entities. Rather, the statutes contemplate a tax on the value of the entire production stream and a prorating of that tax according to the interests owned therein. If this were not true and there were two separate and distinct taxable entities, then there would be no occasion to provide that the total tax should be borne ratably by all interested parties, including royalty interests. Art. 3.03(5), copied in majority opinion.

I believe the incidence of this tax is settled by a proper construction of the statutes as above indicated and that this should settle this portion of this case. I am also of the opinion that the owner of gas royalty has no gas to sell, he having parted with title, defeasible title, to the gas when he (lessor) executed the gas lease. I will not discuss or attempt to explain all of the authorities bearing on this question for the reason that, to me, they are inexplicable.

I know that the royalty interest retained by a lessor in production of oil and gas is a valuable right and that it is subject to taxation as realty. Sheffield v. Hogg, 124 Tex. 290, 77 S.W.2d 1021. I also know that the physical characteristics of oil and gas are different; that under an ordinary oil and gas lease it is feasible and contractually proper for a lessor to demand and receive his portion of the oil produced. I know just the opposite concerning gas. In the oil and gas industry royalty owners sign division orders as to oil; they sign none as to gas. The reason for this obviously is that royalty owners own their proportion of the oil produced and must give their consent to its sale. As to gas, they do not own any portion of the gas produced, hence there is no need for obtaining their consent to its sale. The following cases support my conclusion that the gas produced by appellant was wholly owned by it. It follows that since the royalty owners after execution of the leases involved in this case had no gas to sell, they sold none to appellant. They did have a taxable interest in the gas produced and sold by appellant.

Phillips Petroleum Company v. Bynum, 155 F.2d 196 (5th Cir. 1946); Tidewater Associated Oil Company v. Clemens, 123 S.W.2d 780 (Texarkana Tex.Civ.App.1938) no writ; Stephens County v. Mid-Kansas Oil and Gas Co., 113 Tex. 160, 254 S.W. 290 (1923); Hager v. Stakes, 116 Tex. 453, 294 S.W. 835 (1927); 7 Tex.Law Review 1, "Property Interests Created by a Lease," A. W. Walker, Jr. (1928); Phillips Petroleum Co. v. Ochsner, 146 F.2d 138 (5th Cir. 1944); Phillips Petroleum Co. v. Johnson, 155 F.2d 185 (5th Cir. 1946); Maddox v. Texas Co., 150 F.Supp. 175 (E.D.Tex. 1957); Southland Royalty Co. v. Pan American Petroleum Corp., 354 S.W.2d 184, Tex. Civ.App.El Paso (1962) reversed on other grounds, 378 S.W.2d 50.

Reverting to the base example set out in the majority opinion, the wellhead value of all the gas produced is conclusively shown to be $800, the statutory tax on which is 7%, or $56, which has been paid. Why should the State recover a tax of $63 or a tax of 7.875% of the wellhead value? I can find no valid reason for doing this.

I concur in the majority opinion in its disposition of the second and third points. I would reverse and render judgment as to point one.