**J. M. HUBER CORPORATION, Appellant,**

v.

**William Harvey DENMAN and Jay Pumphrey, Trustees of the Estate of S. B. Burnett, Deceased, et al., Appellees.**

No. 22272.

United States Court of Appeals
Fifth Circuit.

Sept. 20, 1966.

C. C. Small, Jr., Austin, Tex., Thomas O. Moxcey, Denver, Colo., William Tucker, Denver, Colo., Small, Small, & Craig, Austin, Tex., for appellant.

Cecil E. Munn, Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., for appellees.

Before RIVES, BROWN and MOORE,* Circuit Judges.

JOHN R. BROWN, Circuit Judge.

As with another case this day decided,[1] this one, thought by the parties to be a private controversy, turns out to have transcendent public interest issues. In each, besides deciding the private law questions, we direct a reference to the Federal Power Commission for it to determine under the doctrine of primary jurisdiction the jurisdiction of the FPC over rates to be paid for gas royalty. Post argument consideration led the Court to the view that in the ultimate resolution of private law issues, there were problems of great public interest. The Court by memoranda to counsel in this and *Weymouth* (see note 1, supra) called for, and we have received, extensive helpful briefs.[2]

## I.
### The Market Price Royalty Clause

The basic private legal question presented is whether under the terms of the oil and gas lease from Lessors to Lessee-Producer the amount payable as royalty is to be fixed by the stated percentage ($\frac{1}{4}$th) of (a) the price received by the Lessee from its Pipeline Purchaser or (b) the market price for like gas in the field.[3] This turns on the construction of the lease terms in the light of all pertinent factors.

It sharpens the relevance of facts and the significance of the trial Court's actions to bear in mind that the royalty clause in question prescribed (a) a fixed price for a ten-year period and thereafter for the period in controversy (b) the market price of such gas, but not

---

* Of the Second Circuit, sitting by designation.

1. Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84.

2. These included the formal brief of the FPC (with separate statement of Commissioner O'Connor) filed in response to the Court's express request and full exchange of briefs of all counsel in both cases on the FPC issue.

3. Lessor Burnett Estate
Lessee-Producer (the Producer status under FPC) Huber
Pipeline Purchaser Northern Natural

less than the specified minimum.[4] The Lessors contend that it is the market price[5] without limitation to the actual proceeds while the Lessee-Producer urges that the value is fixed by the proceeds received by it from its Pipeline Purchaser.

It likewise steamlines our task to emphasize what the quarrel is not about. Contrary to the sometime colorful charges of the Lessor, the Lessee-Producer does not undertake to say that this clause (note 4, supra) is a "proceeds" rather than a "market price" standard. The Lessee-Producer gears royalty payments to the proceeds from the Pipeline-Purchaser, not because it is a "proceeds" clause, but, rather, because contemporaneous actions and other agreements limit "the market" to that afforded under the Northern Gas contract. The Lessee-Producer refuses, therefore, to get drawn into the academic debate pressed so hard by the Lessors that a market price clause is quite different from a proceeds clause.[6] Indeed, rather than disputing this recognized distinction, the Lessee-Producer asserts that because of other circumstances later discussed the terms "market price" and "market value" were not intended consensually to be used in their usual and ordinary sense. That sense is stated to be the "price at which willing buyers at or about the time of deliveries of gas produced from the leases were agreeing to pay willing sellers for comparable gas." This contention is a paraphrase of issues No. 2 and 3 out of the four stipulated to be tried by the District Judge and which he answered adversely to Lessee-Producer.[7]

---

4. The gas royalty clause reads as follows:

 "To pay the Lessors monthly for one-fourth (¼) of the gas produced at the mouth of the well from any gas well, where gas only is found, four cents per one thousand cubic feet for the first ten years of this contract, and thereafter, the market price of such gas, but in no event shall the price be computed at less than four cents per thousand cubic feet."

 Of production at issue 93% is from the R-Lease, the balance from the B and the M Leases which provided a ⅛ royalty "of the market value in the field," etc.

5. For our purposes the distinction between market "price" and "value" is of no consequence. For simplicity all references will be to "market price."

6. The Lessors stress the following: Phillips Petroleum Co. v. Bynum, 5 Cir., 1946, 155 F.2d 196, 201; Union Producing Co. v. Pardue, 5 Cir., 1941, 117 F.2d 225, 227; Wall v. United Gas Public Service Co., 1934, 178 La. 908, 152 So. 561; Phillips Petroleum Co. v. Johnson, 5 Cir., 1946, 155 F.2d 185, 188, 189; W. R. Davis, Inc. v. State, 1944, 142 Tex. 637, 180 S.W.2d 429, 432; Foster v. Atlantic Refining Co., 5 Cir., 1964, 329 F.2d 485, 489; Sneed, Value of Lessors Share of Production Where Gas Only Is Produced, 25 Tex.Law Rev. 641, 646 (1947). See also, Brown, The Law of Oil and Gas Leases, 1958, §§ 6.09, 6.10.

7. The four stipulated issues were:
 ISSUE NO. 1
 Whether primary administrative jurisdiction of the subject matter is vested in the Federal Power Commission under the Natural Gas Act, 15 U.S.C.A., Secs. 717, et seq.
 ISSUE NO. 2
 Whether the payment of gas royalties to plaintiffs computed on the proceeds derived from the delivery of the gas produced from the wells described in the Amended Complaint to Northern Natural Gas Company in compliance with the "Northern Contract," as amended, fully satisfies all the express and implied obligations of defendant under the terms of the several leases, as amended, which leases are described in the Amended Complaint in respect to the marketing of gas production therefrom and the payment of royalty thereon, irrespective of the market price or the market value in the field of such gas or of gas generally.
 ISSUE NO. 3
 Whether the plaintiffs are legally entitled to collect royalty from defendant computed at a value or price in excess of the applicable effective rate, if any, under the Natural Gas Act, pursuant to the Rules and Regulations of the Federal Power Commission as to gas delivered under the "Northern Contract" to Northern Natural Gas Company, irrespective of the market price

In attacking the findings that it is the "market price" in the traditional legal sense, not the equivalent of the proceeds received from the Pipeline-Purchaser, the Lessee-Producer capsulates it in three steps: (1) this gas has a specific market, i. e., the Northern contract; (2) the market price of such gas is the amount received for the gas delivered to this specific market; (3) the Lessors, because of affirmative participation in the commitment of the gas to this specific market cannot claim there is a market other than the Northern contract. Elaborating, the contention runs, this is not an argument as to the difference in legal concept of "market price" and "proceeds received" clauses. Rather, the question for decision is whether, under the particulars of this case, the Northern Contract market is *the market* from which the market price is to be taken.

The circumstances surrounding the affirmative participation of the Lessors in the commitment of the gas to this particular market as reflected by the stipulation record may be briefly summarized. In early 1936 Lessee-Producer was negotiating with the Lessors for a lease on approximately 6,120 acres of unleased land overlying the Panhandle Gas Field of Texas, some of the land being in the sweet gas area and some of the land in the sour gas area of that Field. During such negotiations, Lessee-Producer was advised by the Lessors that, as a condition precedent to the making of such lease and as a part of the

consideration for such lease, Lessee-Producer must have a positive contract with a pipeline company to take the production from the unleased area after it might be developed.

In order to meet this condition precedent and to establish a positive contract with a pipeline company, Lessee-Producer, on April 21, 1936, entered into the Northern [8] contract with Northern Gas, an interstate pipeline company, even though at that time Lessee-Producer had no lease and no binding agreement to obtain one from Lessors. On June 2, 1936, 42 days after the Northern Gas Contract was arranged, the Lessors delivered the "R-Lease to Lessee-Producer.

Two provisions of the R-Lease are particularly stressed, the first being the gas royalty clause (note 4, supra) and Sec. IX which referred to the preexisting Northern contract demanded as a condition precedent to the lease.[9] Subsequent contractual agreements between these parties also referred specifically to the Northern contract.[10]

Considering the fixed royalty of 4¢ for the first 10-year period expiring June 2, 1946 (note 4, supra), it is significant that under the Northern contract Lessee-Producer was to receive only $3\frac{1}{2}$¢ per MCF until December 26, 1945, and from December 27, 1945, 4¢ for the remainder of the term of the contract (defined to be life of the leases to which it applied). In 1961 the contract price was renegotiated to 11¢ MCF

---

or the market value in the field of such gas or of gas generally.

ISSUE NO. 4

Whether the said gas division orders dated December 27, 1945, identified as Stipulation Exhibits Nos. 48, 49, 50, 51, 52 and 53 were in effect and binding on the plaintiffs on and subsequent to January 1, 1958.

8. Northern Natural Gas Company was then known as Northern Fuel Supply.

9. Section IX of the lease relating to the marketing of gas production reads:
"A contract for the sale of sweet gas produced from that portion of this lease which lies within what is now

known to be the sweet gas area has been entered into between the Northern Fuel Supply Company as buyer and J. M. Huber Petroleum Company, which is the operating subsidiary of Lessee, as Seller. A true and correct copy of said gas sale contract has been furnished by the Lessee to the Lessor."

10. This included the August 10, 1938, lease in which Lessee-Producer undertook to drill and complete a well on the portions then leased and, if productive, "to proceed to deliver gas therefrom under its contract with the Northern Fuel Supply Company." Cited also are the unitization agreements of January 20, 1939 and November 2, 1939.

and after FPC approval, this price was received. During the first 10-year period, the fixed royalty of 4¢ was paid, and no dispute exists as to it. Thereafter until 1961 Lessee-Producer paid royalty at 4¢ and after the 1961 increase on the basis of 11¢.

Against this background, the Lessee-Producer contends that these affirmative contractual actions permanently channeling the gas into the Northern contract bound the Lessor to accept the Northern contract as the sole and exclusive market. As such, these actions constitute as a matter of law, first, an express adoption of the contract, second, a ratification of it, and third, an estoppel to assert that the gas has any other market as between the parties.

In passing upon the stipulated issues 2 and 3 (see note 7, supra), the trial Court made categorical findings of fact that the Lessors, in executing, and the Lessee-Producer in accepting the R-Lease (and two others) intended to use the terms "market price" and "market value" in their usual and ordinary sense and not as synonymous with or identical to proceeds received under the Northern contract.

■ When we bear in mind that in construing the contract, the Court is to put itself in the position of the parties [11] and that the construction put on the contract by responsible action of the parties is frequently the best revelation of its purpose, we think there were ample evidential facts to justify the Judge concluding that the literal terms, generally so well recognized in oil and gas law, should be given their literal meaning.

There was, first, the fact that this lease was the product of extended negotiations conducted under the skilled eyes and hands of highly competent oil and gas lawyers. Realizing as they had to, that the earlier and rejected draft of February 19, 1936, had an express "net proceeds derived from the sale of gas" royalty clause which was in effect replaced by the "market price" clause (note 4, supra) the Lessee-Producer's reported declarations made through its general counsel—a voice not only of management, but with an articulate awareness of the significance of legal terms—clearly put its construction of a market, not a proceeds, basis on this royalty clause. There were similar representations made to the FPC that under its gas leases "it is obligated to pay royalty based on the market price at the wellhead."

■ We do not minimize the beguiling appeal of the Lessee-Producer's theory. Without a doubt, with the Lessors' full approval, this committed until the exhaustion of the reserves [12] all of the gas [13] to this contract and hence to this "market." But the "market" as the descriptive of the buyer or the outlet for the sale is not synonymous with its larger meaning in fixing price or value. For in that situation the law looks not to the particular transaction but the theoretical one between the supposed free seller *vis-a-vis* the contemporary free buyer dealing freely at arm's length supposedly in relation to property which neither will ever own, buy or sell.[14] It was not, as this theory would make it read, an agreement to pay ¼th of the price received from the market on which this gas is sold. Rather, it was to pay

11. American Oil Co. v. Hart, 5 Cir., 1966, 356 F.2d 657.

12. Sun Oil Co. v. FPC, 1960, 364 U.S. 170, 80 S.Ct. 1388, 4 L.Ed.2d 1639; United Gas Pipe Line Co. v. FPC, 5 Cir., 1965, 350 F.2d 689, cert. granted, 1966, 383 U.S. 924, 86 S.Ct. 930, 15 L.Ed.2d 844.

13. The Northern contract applied to only 2,520 acres of the 6,120 acres conveyed under the R-Lease. Consequently, we think the Lessee-Producer persuasively refutes the Lessors' contention that had the intention been to confine the royalty basis to the proceeds of the Northern contract, such contract, otherwise incorporated by reference in Sec. IX, would again have been mentioned specifically.

14. As to the parties, the commodity, the market, is something less than "free" in this highly regulated gas business. See, Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84.

¼th of the "market price" or "market value" as the case might be. The demand that the Lessee-Producer have a firm commitment for the sale of the gas if and when produced—standing alone or in conjunction with the Northern contract—was not inconsistent with the expectation that in the great unknown—the future down to exhaustion of the reserves—the Lessors wanted payment for royalty on the current value of the gas being delivered. So too was it consistent with a desire to have any and all increases without a ceiling while prescribing always the fixed minimum as the floor. The condition precedent demand served another vital purpose. It protected the Lessors against the possibility of producing gas wells being shut in from lack of a commercial outlet, a situation presenting some vexing legal problems.[15] More important than serving attractive grist for the lawyers' mill, and fees, a shut-in is economic frustration for an indeterminate time, certainly until the Lessor can take on another formidable lawsuit to establish breach of the covenants adequately to develop and market.

■ With this analysis falls also the claim based on estoppel. With little more we reject also the claim that the division orders of December 27, 1945, committed the Lessors for the life of the lease to this construction of the royalty clause. (See Issue No. 4, note 7, supra). Coincident with the contractual price increase effective December 27, 1945, new division orders were prepared and executed.[16] The Lessors accepted royalty settlements under the division orders for approximately a year and thereafter attempted a unilateral revocation on January 30, 1947.

■ We think two replies of the Lessors suffice. The first is that as of the moment of execution, December 27, 1945, the royalty clause (note 4, supra) by its terms prescribed the 4¢ royalty for another six months down to June 2, 1946. More important, unless as in Union Producing Co. v. Driskell, 5 Cir., 1941, 117 F.2d 229, in which positions were significantly changed in reliance on the division order, such division orders have limited effectiveness. They do, of course, constitute a precise and definite basis for payments so that payments made in accordance with them are final and binding. Cf. Pan American Petroleum Corp. v. Long, 5 Cir., 1964, 340 F.2d 211, 222. But they may nonetheless be withdrawn as to the future. Phillips Petroleum Co. v. Williams, 5 Cir., 1947, 158 F.2d 723, 727; Chicago Corporation v. Wall, 1956, 156 Tex. 217, 293 S.W.2d 844, 847.

In thus approving the action of the trial Judge on stipulated issues 2, 3 and 4 (note 7, supra) the question left open and yet to be tried under the agreed procedural course is the "market price" of the gas run since June 2, 1946. It is the Lessors' theory that the market price during all or a part of this time has been 23¢ per MCF rather than the 4¢ or 11¢ as paid. Since this claim if sustained, nets a recovery in the neighborhood of $306,530.98 [17] both as a matter of principal and principle, there is a serious question whether a Court, state or federal, either initially or ultimately, may allow any amounts fixed by jury,

15. See Brown, The Law of Oil and Gas Leases, § 6.08, 1966 Cumulative Supplement, 87–98; especially as to Gulf Oil Corporation v. Reid, 1960, 161 Tex. 51, 337 S.W.2d 267; Skelly Oil Co. v. Harris, 1962, 163 Tex. 92, 352 S.W.2d 950, and criticizing our decision in Vernon v. Union Oil Co., 5 Cir., 1959, 270 F.2d 441, and its stare decisis offspring, Duke v. Sun Oil Co., 5 Cir., 1963, 320 F.2d 853.

16. They specifically stated on their face they are applicable to "gas run to North-

ern Natural" and prescribed that "the royalty and working interest [shall be] settled for on the following basis: Four cents (4¢) per thousand cubic feet * * *."

17. Royalties actually paid aggregate $74,-504.47. Royalties now claimed would approximate 95.8% of the total sales price ($319,834.96) received by Lessee-Producer from the Northern contract.

court, or both as increased royalty payments without express prior approval of the Federal Power Commission if, as would these, the price thus fixed would exceed levels prescribed by the FPC.

## II.

### FPC Primary Jurisdiction

The District Judge as to stipulated Issue No. 1 (see note 7, supra) held that the FPC had no jurisdiction over the amount to be paid royalty owners for the so-called royalty gas. This is the position taken by Lessors who vigorously oppose the contrary contention of Lessee-Producer.

In this and the other case [18] this Court was of the view that the public interest in this question loomed so large, that the Court should have at least the tentative views of the FPC. Accordingly, this Court requested that agency to file a brief amicus. Reflecting the seriousness of the problem, the Commission, after a series of extensions of time, filed a formal memorandum brief signed by its General Counsel and Solicitor. From its structure, it is apparent that it is not simply the views of its legal spokesman. It is a considered, although properly hesitant, communication by the Commission itself of its tentative views.[19] All this is demonstrated by the fact that Commissioner O'Connor filed a special statement which reflects the thorough, though ex parte, consideration given within the chambers of the Commission. Following this, the Court expressly invited unlimited comments, replies and rejoinders from all parties in both cases.

Not unnaturally, no party seems to have been moved by these advocative arguments found in not less than 14 memorandum briefs. True, the Lessee-Producer welcomes the FPC as a somewhat strange, but nonetheless formidable, ally. But the positions remain substantially the same. The Lessors deny either jurisdiction of the FPC or the appropriateness of the exercise of any power over royalty payments and contend without reservation that this is just a typical question for court resolution on the record made at a trial. Lessee-Producer asserts that the FPC has primary jurisdiction at least to pass initially on the royalty rates which will, or might, exceed relevant FPC ceilings. The principal difference between Lessee-Producer and FPC is that the Lessee-Producer insists that this is a pure question of law to be decided by this Court whereas the FPC urges that since it is *arguable* that the matter is within its jurisdiction both the question of *jurisdiction* and, if it exists, the appropriateness of the exercise of such power, are matters for primary jurisdiction referral to the FPC for initial decision.

We find ourselves in substantial agreement with the FPC. This means that the dual questions are left open. We emphasize that here, as we do at the close, lest anyone—party, reader, the FPC, reviewing Court, or Trial or Appellate Court after reference—conclude we are declaring any conclusions other than those in Part I as to the legal effect of the gas lease and particularly the Royalty Clause (see note 4, supra) and the decision that it is appropriate that the FPC, rather than this Court, initially determine the jurisdiction of the FPC over royalty payments. Except in those two limited respects, what—and all—we say is to set forth the respective contentions of the protagonists and illumine the problem by factors, pro and con, which might, or might not, have some relevance.

 At the outset we recognize that this is a new application of the doctrine of primary jurisdiction. But considering the broad aim of this device and the consequent flexibility of it [20]

---

18. Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84.

19. The FPC is at pains to disclaim prejudgment, recognizing quite properly that this should await a formal submission and adversary or similar proceeding.

20. United States v. Western Pacific R.R., 1956, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed. 2d 126; Far East Conference v. United States, 1952, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.

there is really nothing startling about submitting to an agency for initial decision the question of its own jurisdiction. That this ultimately is a question of law, probably one of statutory construction, is not fatal. This Court with the express approval of the Supreme Court has ordered primary jurisdiction reference of a pure question of law—the legal validity of exculpatory tariffs.[21] More recently, we have ordered reference of far-reaching legal questions of the Transportation Act and the Agricultural Marketing Act and the interplay of each,[22] just as we have done in having an initial administrative determination of the validity of a tariff as justification for action claimed to violate the antitrust laws.[23]

■ That that question of law happens to be one of jurisdiction does not force a different result. To the contrary, justification for judicial deferral of the jurisdictional question for initial resolution by an agency is even stronger than for a non-jurisdictional question. This is demonstrated by the many cases upholding the jurisdiction of administrative agencies to determine the coverage of their respective statutes and barring

all attempts through judicial proceedings to avoid such determination.[24] Of even more direct pertinence to our problem are the recent cases under the National Labor Relations Act in which the Supreme Court has held that if the record indicates that a labor dispute is "arguably" subject to the jurisdiction of the NLRB, then Courts are not free to determine the question of whether the labor dispute is beyond the power of the Board.[25]

■ We think powerful arguments can be marshalled for and against FPC jurisdiction over royalty payments. A consideration of the various factors demonstrates at least two things. The first is that in the setting of its contemporary construction from the fallout of *Phillips I*[26] it is at least "arguable" that jurisdiction exists. The second is that the factors arguing against jurisdiction are of an intensely practical nature. This is especially so in terms of administrative problems from assuming jurisdiction. Consequently in divining legislative purpose, these matters should be evaluated by the agency having responsibility for operating the statutory ma-

21. River Terminals Corp. v. Southwestern Sugar & Molasses Co., 5 Cir., 1958, 253 F.2d 922, aff'd, 1959, 360 U.S. 411, 79 S. Ct. 1210, 3 L.Ed.2d 1334.

22. Agricultural Transp. Ass'n of Texas v. King, 5 Cir., 1965, 349 F.2d 873. See also, Louisville & N.R.R. v. Knox Homes Corp., 5 Cir., 1965, 343 F.2d 887.

23. Carter v. American Tel. & Tel. Co., 5 Cir., 1966, 365 F.2d 486.

24. The FPC memorandum brief cites as typical: Arkansas Power & Light Co. v. FPC, D.C.D.C., 1945, 60 F.Supp. 907, reversed, 1946, 81 U.S.App.D.C. 178, 156 F.2d 821, reversed, 1947, 330 U.S. 802, 67 S.Ct. 963, 91 L.Ed. 1261; United States v. Sing Tuck, 1904, 194 U.S. 161, 24 S.Ct. 621, 48 L.Ed. 917 (habeas corpus); Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (common law suit for reparations); Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 383, 60 S.Ct. 907, 84 L.Ed. 1263 (suit to enjoin collection of taxes, penalties, and interest demanded on the basis that, as

ruled by the Coal Commission, plaintiff's coal was not exempt from the Bituminous Coal Code).

25. Marine Engineers Beneficial Ass'n, et al. v. Interlake Steamship Co., et al., 1962, 370 U.S. 173, 178, 182, 82 S.Ct. 1237, 8 L.Ed.2d 418; cf. Incres S.S. Co. v. International Maritime Workers, 1963, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557; Myers v. Bethlehem Shipbldg. Corp., 1938, 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; Boire v. Miami Herald Publishing Co., 5 Cir., 1965, 343 F.2d 17, 21; Bokat v. Tidewater Equipment Co., 5 Cir., 1966, 363 F.2d 667. See Boire v. Greyhound Corp., 1964, 376 U.S. 473, 479, 84 S.Ct. 894, 11 L.Ed.2d 849, 854, characterizing Leedom v. Kyne and McCulloch v. Sociedad Nacional, etc. (358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210; 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547, as involving "extraordinary circumstances."

26. Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

chinery. These factors might bear directly upon the question of jurisdiction, as such, and would most certainly bear heavily upon the extent to which the FPC, either by general policy declaration, decision or rule-making, might determine the extent to which the exercise of any such power would be appropriate.

Of course the whole problem centers around whether the dealings with respect to royalty constitute a "sale in interstate commerce for resale" under § 1(b), 15 U.S.C.A. § 717(b).[27] The Act is very specific.[28] But *Phillips I* in broad terms recognized FPC jurisdiction "over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during or after transmission by an interstate pipeline company." 347 U.S. 672, 682, 74 S.Ct. 794, 799.

The FPC looks upon it as another means of achieving a comprehensive effective regulatory scheme.

" * * * When Congress enacted the Natural Gas Act, it was motivated by a desire 'to protect consumers against exploitation at the hands of natural gas companies.' Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 147 [80 S.Ct. 1392, 4 L.Ed.2d 1623]. To that end, Congress 'meant to create a comprehensive and effective regulatory scheme.' Panhandle Eastern Pipe Line Co. v. Public Service Commission, 332 U.S. 507, 520 [68 S.Ct. 190, 92 L.Ed. 128]. See Public Utilities Commission of Ohio v. United Fuel Gas Co., 317 U.S. 456, 467 [63 S.Ct. 369, 87 L.Ed. 396]."

FPC v. Transcontinental Gas Pipe Line Corp., 1961, 365 U.S. 1, 19–20, 81 S.Ct. 435, 445–446, 5 L.Ed.2d 377, 389. And since *Phillips*, a "natural gas" company includes an "independent producer." 18 C.F.R. 154.91.[29]

■■■ At this point Lessors make a most formidable attack. It is the very simple, yet profound, contention that there can be no "sale" of gas by royalty owners since they have no gas to sell. And this seems to be true as a matter of oil and gas law, whether based on the ownership-in-place concept followed by Texas[30] and others or on non-ownership

**27.** "The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S.C.A. § 717(b).

**28.** "Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or resale." Panhandle Eastern Pipe Line Company v. Public Service Commission, 1947, 332 U. S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128, 137.

**29.** "An 'independent producer' as that term is used in this part means any person as defined in the Natural Gas Act who is engaged in the production or gathering of natural gas and who transports natural gas in interstate commerce or sells natural gas in interstate commerce for resale, but who is not primarily engaged in the operation of an interstate pipeline."

**30.** All seem to recognize that under Texas oil and gas law, a gas lease, unlike an oil lease which undertakes to pay for or to deliver in kind royalty oil, constitutes a present sale of all of the gas in place at the time the lease is executed. Theisen v. Robison, 1928, 117 Tex. 489, 8 S.W.2d 646; Phillips Petroleum Co. v. Bynum, 5 Cir., 1946, 155 F.2d 196, 199; Phillips Petroleum Co. v. Johnson, 5 Cir., 1946, 155 F.2d 185, 190.

But although the Landowner-Lessor has no "title" in the gas in place, royalty owners possess some character of property right. See Elliff v. Texon Drilling Co., 1948, 146 Tex. 575, 210 S.W.2d 558, 4 A.L.R.2d 191 (royalty owners recover their interest in gas and distillate lost through a blowout caused by negligent

theories of other jurisdictions.[31] For all agree that as the gas leaves the well-mouth, the entire ownership of the gas is in the lessee, none being reserved in the lessor. Thus, they urge, merely a simple debtor-creditor relationship exists between Lessee-Producer and Lessors.

But this is hardly a decisive answer any more. Ever since the decision in *Rayne Field* [32] the Supreme Court has made it clear that neither the form of the transaction nor the peculiarities of state law are controlling in determining whether there is a jurisdictional sale of gas under the Act. "A regulatory statute such as the Natural Gas Act would be hamstrung if it were tied down to technical concepts of local law." 381 U.S. 392, 400, 85 S.Ct. 1517, 1522, 14 L.Ed.2d 466, 472. That case involved a sale of leasehold interests in a substantially proven and developed gas field. Such lease-sale transaction was consummated while the gas was in the ground and before a cubic foot thereof had moved in interstate commerce. Consideration for such sale of leases was measured by a lump sum price as distinguished from a price per MCF payable on production. By oil and gas business and

legal tests, this was a sale of gas reserves in place. Nevertheless the Supreme Court had no difficulty in determining that it was a "sale" under the Act. "The sales of leases here involved were, in most respects, equivalent to conventional sales of natural gas which unquestionably would be subject to Commission jurisdiction under Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672 [74 S.Ct. 794, 98 L.Ed. 1035]." 381 U.S. 392, at 401, 85 S.Ct. 1517, at 1522. The Court finding great similarity to Gray v. Powell [33] measured the transaction in practical terms. Sales of leases became sales of gas for resale because this "accomplished the transfer of large amounts of natural gas to an interstate pipeline company for resale in other States." Stressing its importance, the Court went on, "[t]hat is the significant and determinative economic fact * * *" and "* * * because of it the Commission * * * acted properly in treating these sales of leasehold interests as sales of natural gas within the meaning of the * * * Act." [34] 381 U.S. 392, 401, 85 S.Ct. 1517, 1523. See also People of State of California v. Lo-Vaca Gathering Co., 1965, 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357.

operations on an adjoining lease) and see McBride v. Hutson, 1957, 157 Tex. 632, 306 S.W.2d 888. Discussing the nature of the royalty interest, the Court said that although the "royalty interest was not, in correct oil and gas legal parlance, a 'mineral interest'" it was "clearly an interest in the minerals, and in the amount of one-eighth thereof, as well as an interest subject to alienation by its owner and taxable *ad valorem* as against him as real estate." The Court went on to say: "* * * the lessor or royalty owner actually owns one-eighth of the same minerals of which the lessee owns seven-eighths, although their respective estates are of different kinds due to the fact that the royalty eighth is free of expense, while the other seven-eighths are burdened with the obligations and conditions of the lease." Young v. Rudd, 1950, Tex.Civ.App., 226 S.W.2d 469; Cates v. Greene, 1938, Tex.Civ.App., 114 S.W.2d 592; Sheffield v. Hogg, 1934, 124 Tex. 290, 77 S.W.2d 1021; Frost v. Standard Oil of Kansas, 1937, Tex.Civ.App., 107 S.W.2d 1037.

31. In 1 Williams and Meyers, Oil & Gas Law, 31, it is shown that 14 states have adopted the ownership-in-place doctrine, 8 the doctrine of nonownership, 1 a qualified doctrine, and in 9 states there is not sufficient information to provide a basis for classification. Texas, therefore, is by no means alone in recognizing and applying this concept.

32. United Gas Improvement Co. v. Continental Oil Co., 1965, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466.

33. 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

34. Neither the Solicitor General nor the Court challenged the genuineness or the good faith of the substitute leasehold sale after conventional sales were rejected by FPC (See 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 at 471). There is thus no indication that the result would have been different had the landowners, as lessors, made the sale of the gas reserves in place direct to Texas Eastern. And there appears to be much justification for

As a corollary to the State-law-no-title-hence-no-sales-concept, the Lessors also argue that the royalty is unrelated to gas produced and is, rather, simply one part of the consideration given and received for the transfer of the gas reserves and the grant of the development privileges under the lease. Although the consideration received by the lessor frequently follows a common pattern [35] this is not necessarily so as the R-Lease in question here demonstrates. Two principal additional factors were the obligation to drill eleven wells plus the securing of an outlet through the Northern sales contract. And, with or without added unusual considerations, even royalty may be complex. Should it be proceeds, market value, market price, a minimum-maximum combination thereof? If a fractional interest, then what fraction—$\frac{1}{8}$th, $\frac{3}{16}$ths, $\frac{1}{4}$th, $\frac{5}{8}$ths, or what? All of these variables lead Lessors to argue that if the FPC has jurisdiction over royalties, then presumably it has jurisdiction over all other types of consideration given. Once that is established, and especially if the pattern of §§ 4 and 5 of the Act is pursued, it means that the FPC is squarely in the middle in determining, or at least approving as a § 7 condition precedent to the grant of a certificate, the terms and provisions of an initial lease between a landowner and a lessee. This would, so the argument continues, run headon into the 1(b) production or gathering proviso (see note 27, supra) and would, in any event, be concerned with transactions so remote in point of time and operation from the sale for resale as to be outside the scope of the Act.

But there are several possible answers which might ultimately be found to have merit. To hold that at some stage, the FPC has the power to review, approve or disapprove the amounts payable as royalty if in excess of FPC established ceilings, does not necessarily forecast a holding of universal jurisdiction over the making of the initial lease or the appraisal, assessment, approval or disapproval of the various elements going to make up the total consideration for the trade. There is, first, of course, the requirement that the transaction constitute a "sale for resale" or interstate transportation. This seldom occurs at this initial stage.[36]

But jumping that hurdle there may be supportable reasons why royalty, for the purposes of the Act is to be distinguished from other kinds of legal considerations. Although in legal concept it is a deferred payment for the initial grant, it bears a direct relation to current production.[37] None is due until there is production. What is due depends directly on the amount of production. As each cubic foot of gas flows through the well-mouth orifice, it is known, therefore, that some specific (or ascertainable) sum is due for that fraction of production prescribed in the royalty clause ($\frac{1}{8}$th, $\frac{3}{16}$th, $\frac{1}{4}$th, etc.).

And this practical consequence becomes more acute in the context of a regulated activity. Whatever may be the legal the-

---

the reading given the case in the FPC memorandum brief:

"It can hardly be doubted * * * that the Supreme Court would have reached the same result if instead the producers in that case had fixed their compensation in terms of a royalty on all gas subsequently sold by Texas Eastern."

35. See, e.g., the description of the characteristic triad of consideration payable to the lessor:

"The benefits accruing to a lessor under a mineral lease, come under three definite classifications, regardless of what various specific appellations may be applied to them, namely, bonus, delay rentals and royalty."
Norvell, J., Garrett v. Dils Co., 1957, 157 Tex. 92, 101, 299 S.W.2d 904, 910 (dissenting opinion).

36. But compare the R-Lease, executed pursuant to the condition precedent that the Northern sales contract be consummated.

37. Occasionally it depends on nonproduction, e.g., under take-or-pay, minimum nomination requirements, etc. See Callery Properties, Inc. v. FPC, 5 Cir., 1964, 335 F.2d 1004, 1021.

ory of title in the gas reserves, the cost of the gas to the Lessee-Producer is in two main categories. There is, first, the actual costs for exploration, development and production of all of the gas, both the working interest (e. g., 7/8ths) and the royalty (e. g., 1/8th). The second is the amount paid as royalty for the fraction prescribed as royalty. This second element is directly attributable to actual gas delivered through the well-mouth and is ordinarily measured directly thereby.[38]

The direct, immediate importance of royalty payments and the position of royalty owners in the regulatory scheme of the Act has been recognized by the FPC in both a general [39] and specific way in the area rate proceedings,[40] which many hope, will afford a workable solution. In the Permian Basin area rate decision, No. AR 61–1, opinion 468, 33 FPC * * * (now pending on review in the 10th Circuit), a forerunner of other area rate proceedings including the Hugoton-Anadarko area, No. AR 64–1, 30 FPC 1354, covering the gas fields involved here, it was treated as one of the significant costs.[41] Although ap-

38. We have treated amounts due under "take-or-pay" clauses as sales of gas. See note 37, supra.

39. On a cost of service approach, Landowner-Lessors would generally benefit from dealing with a high cost Lessee-Producer.

40. In re Phillips Petroleum Co., 1960, 24 FPC 537; Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (Phillips II).

41. Both the Examiner and the Commission calculated royalty at 12.5% (1/8th) of the selling price (presumably on a "proceeds" basis). The Commission changed the allowed amount slightly because of other adjustments. Showing that the Commission does not lump this "cost" in with others constituting both cost and consideration payable to lessor (e. g., "exploration and development costs" or "depletion, depreciation, and amortization of production investment costs") is the excerpt from Opinion No. 468:

| | Cost in Cents per Mcf | |
| --- | --- | --- |
| | Examiner | Commission |
| Exploration and Development Costs | | |
| Dry Holes | 1.07 | 1.42 |
| Other Exploratory Costs | 1.19 | 1.59 |
| Allowance for Growth | .83 | 1.11 |
| Production Operating Expense | 2.88 | 2.70 |
| Net Liquid Credit | (2.68) | (3.10) |
| Regulatory Expense | .14 | .14 |
| Depletion, Depreciation, and Amortization of Production Investment Costs | | |
| Successful Well Costs | 2.16 | 2.42 |
| Lease Acquisition Costs | .57 | .64 |
| Cost of Other Production Facilities | .23 | .26 |
| Return on Production Investment (at 12%) | 3.91 | 4.38 |
| Return on Working Capital | .20 | .35 |
| Subtotal | 10.50 | 11.91 |
| Royalty at 12½% | 1.60 | 1.83 |
| Production Taxes | .72 | .90 |
| Total | 12.82 | 14.64 |

For a jurisdictional sale, royalty payments are considered an operating expense under Account Number 758, Commission's Uniform System of Accounting of Accounts for Natural Gas Companies, 18 C.F.R. Part 201, Account Number 758.

parently not discussing it in terms of cost attributable to royalty payments, the Commission recognizes generally that particular producers might be able to justify above-ceiling prices where costs exceed the area average and revenues.[42]

Its dynamic significance is dramatically illustrated by contemplating the dollar and cents impact of full success by the Lessors. Still unproved and obviously subject factually to much downward adjustment depending on proof of factors on market value,[43] the Lessors complaint demanded 23¢ MCF. This is in sharp contrast to the FPC ceiling of 11¢ MCF

and far exceeds the FPC anti-triggering guideline of 19¢.[44] This poses a substantial threat to Northern,[45] the Pipeline Purchaser, depending upon the extent to which the FPC would allow the increase in Lessee-Producer's cost of service to be passed on or, if forbidden by *Mobile*[46] contract terms the extent to which the FPC would grant § 5 relief if the lower contractual maximum (11¢) was held to be not fair and reasonable.

Even assuming FPC rejection of Lessee-Producer's requested price increases from Northern, the other possible relief to avoid confiscation—abandonment—[47]

42. "It would seem clear that where a producer who has contracted for an above-ceiling price can show that his out-of-pocket expenses in connection with the operation of a particular well are greater than the revenues under the applicable area price, he should be entitled to appropriate relief, and there may be other circumstances where a producer as a matter of law or in the public interest would be entitled to some relief." (FPC Opinion No. 468, p. 105.)

Of course this has to be read in the light of this declaration:

"A significant early ruling in this proceeding was the Commission's order of May 14, 1962, holding that individual company cost-of-service evidence would not be received in evidence but that composite cost studies would be admissible." (FPC Op. 468, p. 2.)

and Mr. Justice Clark dissenting, Wisconsin v. FPC, 1963, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357, apparently forecasts constitutional questions in this event:

"Moreover, it must be remembered that the burden of proving just and reasonable rates is on the producer and he cannot be precluded from offering relevant proof of his cost. This he will demand in the event his statistics show his costs above those fixed for his area. And so the cold truth is that, after all of its area pricing investigation and the fixing of a rate pursuant thereto, the producer aggrieved at that rate may demand and be entitled to a full hearing on his cost." 373 U.S. 328, 83 S.Ct. 1284.

43. See, Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84.

44. Commissioner O'Connor in his separate statement summarizes the FPC ceilings:

"For the pricing area here involved, the increased rate ceiling is 11.0¢ per

MCF (at 14.65 psia), and the ceiling for initial rate filings is 17.0¢. See Statement of General Policy No. 61–1, 24 FPC 818. For certain filed rate schedules, subject to the producer eliminating certain escalation clauses in the underlying contract, the guidelines are 11.6¢ and 12.0¢. See Seventh Amendment to the Statement of General Policy No. 61–1, 30 FPC 1370. The antitriggering guideline has been determined to be 19.0¢. See Tenth Amendment to the Statement of General Policy No. 61–1 (Order No. 296, issued April 5, 1965). There has been no in-line determination for Texas Railroad District No. 10, and there is no just and reasonable rate yet prescribed for the area, although such a proceeding is presently in hearing. See order instituting Area Rate Proceeding (Hugoton-Anadarko Area), Docket No. AR64–1, 30 FPC 1354."

45. Northern now has 11¢ MCF field cost under the amended contract. This field cost would increase by 3¢ MCF if royalty is payable at 23¢ MCF as claimed. If passed on by Lessee-Producer to Northern, the price to Northern would increase from 11¢ to 14¢ MCF.

46. United Gas Pipe Line Co. v. Mobile Gas Service Corp., 1956, 350 U.S. 332, 76 S. Ct. 373, 100 L.Ed. 373; cf. United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division, 1958, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153.

47. Speaking of producers having excess costs, the FPC stated:

"Even in situation where producers are able to show that they are entitled to relief from the obligation to continue to sell flowing gas at the appropriate area ceiling, in most cases it may be

jeopardizes the interest of Northern, its immediate customers, its ultimate customers at the burner tips and the public interest generally in the withdrawal of these huge reserves from the interstate market.

The prospect affords little comfort to the Lessee-Producer here. Invoking contractual provisions which purported to release the parties in the event the subject matter came under regulation of state or federal agencies, its unilateral discontinuance of service was rejected by the Commission and the Third Circuit. J. M. Huber Corp. v. FPC, 3 Cir., 1956, 236 F.2d 550, cert. denied, 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324 (approved Continental Oil Co. v. FPC, 5 Cir., 1959, 266 F.2d 208).

To the Lessors, another telling blow against even the likelihood of FPC jurisdiction is the "historical" fact that the FPC has not yet asserted this power.[48] Indeed, the contention runs, its own administrative regulations and practices provide no machinery for passing on the

level of payments of royalty made by a Lessee-Producer to a Lessor.

Amplifying its more cryptic telegraphic advices to Lessee-Producer,[49] the FPC's memorandum brief is a candid statement that it has not undertaken so far to regulate royalty rates. According to the FPC's memorandum brief which we either repeat or slightly paraphrase, the FPC historically has regulated jurisdictional sales of independent producers by requiring either the operator of the producing properties or signatory working interest owners to make the certificate and rate filings required under the Natural Gas Act. It is made for all of the gas involved in the particular sales contract regardless of the number of individuals or entities who may own separate interest therein.[50] Following *Phillips I* the FPC issued its order No. 174 series[51] in which it set forth the filing requirements applicable to independent producers. Those orders provided that independent producers should file certificate applications and rate schedules, but did not undertake to distinguish between

---

sufficient to permit them to abandon their unprofitable sales."
FPC Permian Basin Area Rate Opinion No. 468, p. 105.

48. There are two isolated exceptions. Northern Natural Gas Producing Company, Docket Nos. G-1084 and G-1001, August 30, 1956 (unreported), 6 Oil and Gas Reporter 538 and Elk River Co. & Lumber Co., FPC Gas Rate Schedule No. 1, issued August 30, 1956 (unreported), 6 Oil and Gas Reporter 538. The FPC's memorandum brief treats these cases, and we think properly so, as "unique." Commissioner Digby, dissenting, discerned the far-reaching implications of the assertion of FPC jurisdiction "over the sale by royalty owners of gas retained either in an original commercial lease or by an overriding provision in an assignment of a lease." But as a matter of practice, the FPC has not pursued it.

49. Apparently to respond to this Court's prehearing request for supplemental memoranda, Lessee-Producer wired the FPC: "We represent a lessor entitled under a gas lease to a monetary royalty based on the market price of the gas. The lessee owns eight-eighths of the gas and sells it in interstate commerce for re-

sale. Can you advise whether the FPC fixes royalty rates between lessor and lessee or has any procedure to adjudicate such a dispute."
To this the FPC responded:
"Reurtel November 5 Federal Power Commission does not fix royalty rates between a lessor and lessee nor does it have any procedure to adjudicate such a dispute."

50. The provisions applicable to filings by independent producers are contained in § 154.91 of the regulations, 18 C.F.R. 154.-91.

51. Order No. 174, Docket No. R-138, issued July 16, 1954, 13 FPC 1195; Order No. 174-A, issued August 6, 1954, and modified September 24, 1954, 13 FPC 1255, 1410; and Order No. 174-B, issued December 17, 1954, 13 FPC 1576. These orders were the subject of extended treatment in a number of cases, but found by this Court to be nonreviewable. Magnolia Petroleum Co. v. FPC, 5 Cir., 1956, 236 F.2d 785, cert. denied, 1957, 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322; (see related cases 236 F.2d 812, 813, 816, 819, 824, 827, 828, 830, 835, 839 and editorial note 236 F.2d 785 at 793.)

an operator and an owner of some other interest except that, in order to relieve large numbers of parties from the filing requirements, order No. 174-B, 13 FPC at 1577–1579, provided that if the operator made a filing, other interested parties were not required to file. At that time there were no provisions prohibiting a filing by a non-signatory interest owner. Nevertheless, in two decisions,[52] the FPC ruled that a non-signatory interest owner was not entitled to file under the regulations then in effect.[53] Subsequently the Commission [54] amended § 154.91 to codify the action taken by it in the *Humble* and *Midstates* cases.[55] As the regulations now stand (barring waiver for good cause) [56] only the signatory operator or signatory interest to a jurisdictional gas sales contract may file. The signatory operator is required to file under § 154.91(b). Under § 154.91(c) other signatory interest owners may file, but are not required to do so unless the operator is not a signatory party. Under § 154.91(d) a nonsignatory interest owner is not permitted to file.

The upshot of it is that the FPC regulations do not presently provide for separate filings by landowner royalty interests or overriding royalty interests who are not themselves signatory parties to the gas sales contract. Nor are operators required generally to provide information with respect to royalty interests in filing their applications for certificates to make jurisdictional sales.[57]

But Lessee-Pipeline (and the FPC memorandum brief) counter with a good deal of force that this nonaction proves little—certainly not in the light of *Phillips I* which put an end to 26 years of administrative inaction. The reach of power and the scope of regulation are not necessarily synonymous. The FPC, as any other administrative agency, has considerable discretion in determining the extent to which admitted power is to be employed, especially in terms of detailed administrative regulations.[58] And certainly this would be true if, as the FPC's memorandum brief asserts as a fact, there have been no occasions until the inquiry by this Court for the FPC either to pass upon royalty payments or its power to do so. For that matter, if the FPC finds the statutory power to exist and this is affirmed by the reviewing court, there is still a great likelihood that few of the transactions *vis-a-vis* Lessor—Lessee-Producer will have to come under FPC scrutiny as such. Thus, a "proceeds" royalty transaction presents no problem. The price collected by Lessee-Producer will at all times be subject to FPC regulation, within FPC established ceilings or collected subject to refund upon determination of the fair, just

52. Humble Oil & Refining Co., 14 FPC 592; Midstates Oil Corp., 14 FPC 703.

53. This Court in Sun Oil Co. v. FPC, 5 Cir., 1958, 256 F.2d 233, cert. denied, 1958, 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103, affirmed the Commission's practice under § 154.91 of not permitting nonoperating, nonsignatory interest owners to file.

54. Order No. 190, 16 FPC 492.

55. Sun Oil Co. v. FPC, 5 Cir., 1958, 256 F.2d 233, cert. denied, 1958, 358 U.S. 872, 79 S.Ct. 111, 3 L.Ed.2d 103. (See note 53, supra.)

56. See § 1.7(b), 18 C.F.R. 1.7(b).

57. The FPC suggests that this is the same approach it has taken with respect to

percentage sales contracts (e.g., resale of the residue gas from a processing plant). Under § 154.91(e) the regulation so far has been at the processing plant end, not the sale by the Lessee-Producer to the processing plant. With admitted power to regulate the Lessee-Producer's sale to the processor, the FPC purposefully declines to do so because it is unnecessary to effective regulation. See FPC Opinion 468, Docket No. AR 61-1, p. 71.

58. See, e.g., dollar jurisdictional standards established by the National Labor Relations Board.

The FPC has done this by establishing a category of special certificate authorization for small producers. Rate and certificate filings by small independent producers, Order No. 308, October 29, 1965, 30 F.Reg. 14009.

and reasonable rate.[59] §§ 4, 5. Likewise, increases in the amounts payable for royalty, whether arising automatically by escalation, favored nation clauses, or the like, or through the forces of supply and demand in fixing the market price under a market price clause need not be reviewed if the increased price to be paid is still within the relevant FPC ceilings.

It might turn out, therefore, that the FPC, assuming the existence of the power to regulate the price paid for royalty for gas admittedly sold for resale and transported in interstate commerce, will be confined to two principal objectives. First, would be suitable regulations requiring the signatory working interest owner at the time of certification to report fully on the status and nature of the royalty obligations with subsequent or periodic reports as to changes thereon and the level of payments being made therefor. The second would be a requirement that before an amount in excess of the relevant FPC ceilings could be *payable*, either as a result of unilateral action by negotiation, compromise, or by court judgment, an application would first have to be filed for approval, rejection, or modification by the FPC. That hardly signals the chaos to which Lessors with much feeling prophesy.[60] And chaos or not, it must be remembered that if—and so far the if is a big one— the amounts paid for royalty constitute a "rate", §§ 4, 5, then primary jurisdic-

tion is not only a matter of initial determination by the administrative agency. Rather it then becomes the exclusive role of the agency. State of Georgia v. Pennsylvania R.R., 1945, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051; Northern Natural Gas Co. v. State Corporation Commission of Kansas, 1963, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601; Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 1951, 341 U.S. 246, 251, 252, 71 S.Ct. 692, 95 L.Ed. 912; Socony Mobil Oil Co. v. Brooklyn Union Gas Co., 5 Cir., 1962, 299 F.2d 692, cert. denied, 371 U.S. 887, 83 S.Ct. 182, 9 L.Ed.2d 121, following the stay of this Court issued in Magnolia Petroleum Co. v. Federal Power Commission, 5 Cir., 1956, 236 F.2d 785, cert. denied, 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322.

Thus we end, as we began, a consideration of these factors pro and con demonstrate that there is at least an arguable basis for FPC jurisdiction. Moreover, these factors ought first to be evaluated by the FPC in the resolution of the question of statutory power and, if that is found to exist, the necessary implementation of that in terms of the extent to which the exercise of that power is or will be appropriate. Lest we be misunderstood, we emphasize again that this analysis is merely to indicate why we conclude primary jurisdiction reference should be made, the Court all the while disclaims any purpose by what

59. Even there, the FPC memorandum brief points out that some regulatory control might be needed, if the percentage royalty interest (e.g., ⅛th) is increased markedly (e.g., ¼th, ⅜ths, ½, etc.) with consequent significant increase in the price of gas to the consumer or an impairment of the exploratory developmental activities of the producer.

60. In attempting to resolve these difficult problems, the Court is not helped by the coercive tone of Lessor's statement that "if the court should yield to the FPC's demand that the parties be relegated to an administrative hearing * * * then whatever right the royalty owners in this case have is irretrievably lost. We simply cannot afford the luxury of an FPC hearing. By economic compulsion we will

choose as the only feasible course of action to abandon the litigation and bow to Huber's will."

First, this is no contest between unequal combatants. On Lessors' claim for the years involved, over $300,000 is at stake with much more apt to follow on principles of collateral estoppel as to years subsequent to those in suit. Of more significance, this question is of vital importance to the public interest. Its impact will transcend the parties, the period of time involved here, and this particular relationship. In these two cases large volumes of gas and sums of money are involved and the trial Judge observed that there are "several other similar cases on the docket of this court in the Amarillo Division."

it has said or left unsaid, by its comments, express or implied, of declaring or intimating what its views are on the questions referred for initial decision by the FPC and the arguments pro and con.

### III.

We therefore affirm the District Court on issues Nos. 2, 3, and 4 (Note 7, supra), but vacate the holding as to issue No. 1 and remand the cause to the District Court for further consistent proceedings.[61] Specifically, the District Court should defer further action including fixing of the actual "market price" pending invocation [62] by the parties of a ruling by the FPC: (1) (a) as to the jurisdiction of the FPC over payment for royalties for gas sold for resale and transported in interstate commerce, (b) the status of a royalty interest owner's transaction as a sale under the Act where incident to a sale for resale and transportation in interstate commerce, (c) the status of the royalty interest owner's transaction in this case as a sale under the Act; (2) if it should be determined that the FPC has jurisdiction and that at some stage or time the royalty transaction for payment therefor constitutes a sale under the Act (a) the filing requirements, if any, for certification and if required by whom and when, (b) the extent, if any, to which prior application to and approval by the FPC is required as to (i) the type, kind or nature of the royalty clause, (proceeds, market price, etc.), the percentage thereof (e. g., $\frac{1}{8}$th, $\frac{1}{4}$th, etc.), (ii) monetary payments which do not exceed relevant FPC ceilings, (iii) monetary payments which are or will likely be in excess of relevant FPC ceilings.

For obvious reasons we do not undertake to blueprint the proceedings before the Commission. Nor, in specifying the specific subjects of inquiry and report, do we mean to foreclose other relevant, specific inquiries or variations thereof which might be developed in the proceeding and which will or might have a significant bearing upon the substantial public issue questions of great importance. Rather, the test should be: when the FPC rules and the reviewing Court [63] enforces, will the decision likely supply the answers needed by the trial Court in determining precisely and to what extent matters are or are not for FPC determination and those reserved for court determination? [64]

Affirmed in part.

Reversed and remanded in part.

---

**61.** In view of the acute public interest, dismissal under F.R.Civ.P. 41(a) (2) is not in order but if, as suggested (note 60, supra) the Lessor declines, then the Court has ample power to require Lessee-Pipeline to go forward with the reference to FPC.

**62.** The FPC memorandum brief states that this may be done in a number of ways: E. g., by a complaint under § 1.6(b) or petition for declaratory order or other relief under §§ 1.7(a), (b), or (c), of the Commission's Rules of Practice and Procedure (18 C.F.R. §§ 1.6(b); 1.7(a), (b), or (c). Other procedures in which the questions might be raised could be initiated by application for a certificate of public convenience and necessity under Part 157 or submission of a rate schedule for filing under Part 154 of the Commission's Regulations Under the Natural Gas Act (18 C.F.R. Parts 157 and 154).

**63.** Under § 19 of the Act review is to the Court of Appeals. See FPC v. Texaco, Inc., 1964, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112. The presence of intervenors might, therefore, take review out of the 5th Circuit and return it to us later as a matter of established law.

**64.** To assure that each of the respective trial Courts, the FPC and reviewing Courts will know precisely what was before us, we direct that the Clerk of this Court will on remand include in each record copies of the pre- and post-argument memoranda from Court to counsel in both cases and all briefs, memoranda filed in both cases with respect thereto. Counsel are requested to collaborate with the Clerk in affording requisite copies.